### 4282.   EMPIRE LIFE INSURANCE CO. *v.* EINSTEIN.

1. A party who induces or procures a wrong ruling of the court will not thereafter be heard to complain of the ruling.
2. The court did not err in declining to require a witness to testify who claimed the privilege of refusing to testify because the testimony sought to be elicited from him would tend to incriminate him.
3. As a general rule, it is the province of the court to determine the competency of both the evidence and the witness; and if the judge decides that the witness is incompetent, his ruling. will not be interfered with, unless it is manifestly erroneous. A trial judge may determine the competency of a witness without submitting to him questions designed to elicit specific information as to particular points. In this event, the court passes upon the competency of the witness. When, however, the witness is otherwise competent, he may decline to answer questions which tend to criminate him; and in this event the witness, and not the judge, is to determine whether the answer to the question propounded to him will have the effect of subjecting him to punishment for crime.
4. An exception in a policy of insurance is to be taken most strongly against the insurer. The contract is to be construed most liberally in favor of the insured.
5. The provision in a policy of insurance, that "if the insured shall, within one year from the date hereof, die as the result of a violation of the law," the amount payable under the policy shall be confined to the premiums which have been paid, with interest thereon, will not defeat or prevent recovery of the full amount of the policy, unless it appears that the violation of the law on the part of the insured was the direct, natural, and legally proximate cause of his death.
6. Though, in a certain sense, the act of the insured in the present case caused his death (because he provoked the difficulty in which he was killed), yet since his death could not reasonably have been anticipated·

as a result of his violation of the law, and was not shown to be the natural and proper legal consequence thereof, the insurer failed to carry the burden resting upon it of sustaining its defense; and the judge did not err in directing a verdict for the plaintiff. The insurer having assumed the burden of showing that the death of the insured by homicide was the result of his own violation of the law, the usual rule that the slayer's guilt must be established beyond a reasonable doubt was not applicable, and it devolved upon the insurer to prove that the slayer was guiltless.

7. As no reason appears why the slayer should have killed the insured, except through anger, and as the law will not justify a killing in resentment of opprobrious words, nor permit the use of a deadly weapon in resistance of a mere assault with the hands, the defendant failed to justify the killing of the insured. The circumstances by which the insurer sought to carry the burden of proving that the killing was caused by the reasonable fears of the slayer can not be held to warrant an inference that the slayer was in fact actuated by such fears.

DECIDED FEBRUARY 19, 1913.

Action on insurance policy; from city court of Camilla—R. L. Shipp, judge pro hac vice. May 4, 1912.

*F. A. Hooper, Pope & Bennet,* for plaintiff in error.

*E. E. Cox,* contra.

RUSSELL, J. There are two questions raised by the record: (1) whether the court improperly prevented the defendant from eliciting from a witness evidence which might have caused a different result; and (2), if the court did not err in that respect, whether the verdict which the court directed was demanded by the evidence submitted. In the motion for a new trial the defendant complains that the court permitted the witness to determine for himself whether the answers to certain questions which were propounded to him would tend to criminate him. As to this we think the court ruled correctly. In a note to this ground of the motion for a new trial the trial judge sets forth what took place as to this. After counsel for the defendant had asked the witness one or more questions, the judge interposed and asked the witness: "Have you any attorney to represent you in any way in this matter?" The judge added: "I don't know whether the witness knows his rights. I do not care to go into it if he does." The witness then answered: "Yes, sir; Mr. Davis represents me." The court then asked the witness: "Do you understand that you do not have to answer questions if you do not want to? Do you understand that view of the case?" The witness replied: "Yes, sir. I do not

know." The court then said to the witness: "'I shall be glad to have Mr. Davis present, and have him signify as to any question that is asked you on examination." At this point Mr. Hooper, of counsel for the defendant, said to the court: "I think the witness has a right to use the privilege whenever he pleases." And thereupon the court said to the witness: "You need not answer any question you do not want to. In the absence of your counsel you can exercise your own judgment, provided you think your answer might criminate you." Counsel for the defendant thereupon objected, and contended that the court should in each instance pass upon the question as to whether the answer might criminate the witness. The court then said to the witness: "You heard the statement that Mr. Hooper made with reference to what you have to answer and what you do not?" The witness replied: "I do not care to tell anything about it. I do not care to testify at all." The court then said: "My ruling was made under the statement as to what you, counsel for the defendant, say is the law." After section 6362 of the code, which provides that "No person shall be compelled to give testimony tending in any manner to criminate himself," had been read, the court said to the witness: "You will have to be the judge; the court can not be the judge. You will have to be the judge of what may or may not tend to criminate you." Thereupon Mr. Bennet, of counsel for the defendant, stated that if the witness were permitted to answer the questions which counsel sought to ask, he expected him to testify that he was first attacked by D. D. Einstein, and that, before the witness shot at all, he was shot through the wrist by D. D. Einstein, and that the witness shot under circumstances of justification, believing his life was in danger. Thereupon the court said to the witness: "You have heard him state what he expected to prove by you. Now you can either tell that to the jury or not, just as you see fit. You will either have to tell it, or refuse to tell it on the ground that you fear it would criminate you." Upon this ruling the witness replied: "I do not care to testify at all." And though the court stated that he must place his refusal to testify on the ground just stated by the court, the witness declined to testify further.

1. We do not think the assignment of error, when qualified by the note of the presiding judge, presents a meritorious exception; for when the counsel, Mr. Hooper, as is expressly stated by the

judge, invoked or induced the ruling which the judge first made, by his statement to the effect that the witness had the right to use the privilege whenever he pleased (although Mr. Bennet, his associate, seemed to have taken a different view), an ample opportunity was offered the witness to answer the questions, if he so desired; and there is nothing to show that he did not understand the purport of the questions from the statement of Mr. Bennet as to what he expected to prove if the questions were answered. If the judge's ruling had been based entirely upon Mr. Hooper's statement of his understanding of the law, the defendant could not complain; for nothing is better settled than that one can not complain of a ruling which he himself invokes. He will not be heard to complain even if the ruling be erroneous.

2. But aside from this, the ruling was not erroneous; for when a witness claims his privilege upon the ground that he may criminate himself by answering questions propounded to him, he at last, and not the court, must determine whether the information given by his response to the question will have the effect of jeopardizing his liberty by tending to show his guilt of crime. There is nothing to the contrary of this in the ruling of the Supreme Court in *Pledger* v. *State, 77 Ga.* 242 (3 S. E. 320). In that case nothing more is ruled on this point than that the witness could not, without being in contempt of the court, stand in silence, not claiming his privilege and permitting the court to pass upon it, and refuse to testify at all. The court said that he might have declined to answer any question having such a tendency, and he would have been protected had he insisted upon such a right. "He did not wait for an opportunity to make the question  .  . He made no such question.  .  . But apprehending in advance that he might be placed in a perilous position, he refused stubbornly, before the exigency had arisen, to testify at all." In the present case, according to the explanatory note of the judge, the witness was fully apprised, by the statement of Mr. Bennet, as to the scope of the examination to which he was to be subjected, and as to the character of the answers expected; and, under the judge's ruling that if the answers would criminate him, he might decline to answer them, he did decline. It is true the court left it to the witness to judge whether the answers, if he answered truthfully, would tend to criminate him; and in this the court was right. Sometimes only a

slight circumstance is needed to fix guilt upon a person who could not be convicted but for proof of that circumstance. And again, who but the accused can so well know the importance of concealing particular facts and circumstances which may be the means of his undoing?

In the trial of Aaron Burr (Fed. Cas. No. 14, 692 e) the Chief Justice ruled as follows: "When a question is propounded, it belongs to the court to consider and to decide whether any direct answer to it can implicate the witness. If this be decided in the negative, then he may answer it without violating the privilege which is secured to him by law. If a direct answer to it *may* criminate himself, then *he* must be the sole judge what his answer would be. The court can not participate with him in this judgment, because they can not decide on the effect of his answer without knowing what it would be; and a disclosure of that fact to the judges would strip him of the privileges which the law allows, and which he claims. It follows necessarily, then, from this state of things, that if the question be of such a description that the answer to it may or may not criminate the witness, according to the purport of that answer, it must rest with himself, who alone can tell what it would be, to answer the question or not. If, in such a case, he say, upon his oath, that his answer would criminate himself, the court can demand no other testimony of the fact." And in answering the construction placed by the counsel for the United States upon this rule, and which the Chief Justice declares to be too narrow, the court says, that to compel a witness to answer a question when the answer, connected with other testimony, would be insufficient to convict him of crime, would be rendering the rule almost perfectly worthless. Many links frequently compose that chain of testimony which is necessary to convict any individual of a crime. It appears to the court to be the true sense of the rule that no witness is compellable to furnish any one of them against himself. It is certainly not only a possible, but a probable, case, that a witness, by disclosing a single fact, may complete the testimony against himself, and to every effectual purpose accuse himself as entirely as he would by stating every circumstance which would be required for his conviction. That fact of itself might be unavailing; but all other facts without it might be insufficient. While that remains concealed within his own bosom he

is safe; but draw it from thence, and he is exposed to prosecution. The rule that declares that no man is compelled to accuse himself would most obviously be infringed by compelling a witness to disclose a fact of this description. What testimony may be possessed, or is attainable, against any individual, the court can never know. It would seem, then, that the court ought never to compel a witness to give an answer which discloses a fact which might form a necessary and essential part of a crime, which is punishable by the laws." 1 Burr's Trial, 244, 245. See Brown *v.* Walker, 161 U. S. 613 (16 Sup. Ct. 644, 40 L. ed. 827).

3. But we can go further than this in the present case, because the court would have been justified in holding, after the witness stated that he did not desire to testify and the reason therefor was apparent to the court, that he was not a competent witness, in the sense that he was not such a witness as should be compelled to testify at all. Evidence had already been introduced before the court showing that the witness (Campbell) had killed Einstein, and no evidence of such a character was introduced as would have given him immunity in case his testimony would have had a tendency to criminate himself. There is nothing in the record to show whether Campbell had been tried for homicide, or that he would not be tried; and, of course, if he should be indicted for murder, no length of time would bar the prosecution. As a general rule it is the province of the court to determine the competency of both the evidence and the witness. 3 Encyc. Ev. 168. In *Peterson* v. *State,* 47 *Ga.* 524, it was held that the court could judge of the competency of a child; and so we think that where there has been introduced evidence tending to show the commission of a crime by a person who is called upon to testify, the judge, without formal examination of the witness, can summarily adjudge him to be incompetent (or at least not compellable) to testify as to that transaction, if the witness claims the privilege of refusing to testify, on the ground that his testimony may tend to criminate him. Of course, this right of the judge to pass upon the competency of witnesses is one which he must exercise of his own discretion, without the intervention of any one. In Simpson *v.* State, 31 Ind. 90, it was held to be error for the court to refer the competency of the witness to referees, who retired with the witness and made a private examination. Whenever questions of law alone are

involved in the determination of competency, the court must decide them. State *v.* Williams, 67 N. C. 12; Commonwealth *v.* Gray, 129 Mass. 474 (37 Am. Rep. 378). We think that, under the rule which permits the witness to judge for himself whether the information sought from him will tend to criminate him, the judge did not err in his ruling; and that even if he did not permit the questions to be asked, he would not have erred; for it is apparent, from the testimony of other witnesses, that no questions could be asked of this witness material to the investigation then pending (to wit, as to the details of the insured's death) which would not tend to criminate the witness; and, therefore, if he claimed his privilege, he could well be held altogether incompetent to testify.

4.  We agree with counsel for the plaintiff in error that the stipulation of the policy with which the present litigation is concerned does not provide for a forfeiture; and, for that reason, the rule that the courts will seek for an excuse to avoid a forfeiture, upon the ground that forfeitures are odious, does not apply. But it is one of the conditions of the policy; and, under the general rule that policies of insurance are to be construed most liberally in favor of the insured, because the contract was proposed by the insurer, this exception will be taken most strongly against the insurer. By this we mean that in a case such as that before us, where the insurer attempts to defend upon proof of a violation of the contract by the insured, it will be required that the insurer carry the burden which it has assumed, and prove its defense by plain and unequivocal evidence. We do not think the insurer has succeeded in doing this in the present case. The burden which it assumed was that of proving that the death of the insured was the result of his violation of the law, and we are therefore to ascertain whether the preponderance of the evidence so establishes that fact as that the jury would have been authorized to find a verdict different from that directed by the court.

5.  The provision in a policy of insurance that, "if the insured shall, within one year from the date hereof, die as the result of a violation of the law," the amount payable under the policy shall be confined to the premiums which have been paid, with interest thereon, will not defeat or prevent the recovery of the full amount of the policy, unless it appears that the violation of the law on the part of the insured was the direct, natural and legally proximate cause of his death.

6. The plaintiff in error contends that the jury would have been authorized to find, from the evidence, that Campbell was only guilty at most of voluntary manslaughter, and might have found that he was justifiable. It is not so important, in our opinion, what the jury might have found Campbell to be guilty of, as whether the jury could have found that the death of Einstein was the direct, necessary, reasonable, and legally proximate result of his own unlawful act. The real question is whether Einstein's violation of the law was the proximate cause of his death. All other issues (such as, what offense, if any, Campbell, who killed him, might be guilty of, or whether in fact he was justifiable) are subordinate to this. If it is immaterial that Einstein provoked the difficulty by using opprobrious words and striking Campbell (because this can not be held to be the causa causans of Einstein's death), then the judge's ruling as to Campbell's testimony is unimportant; for even if Campbell had testified to such a state of facts as must have convinced a jury that he was justifiable in killing Einstein, still the insurer would not be relieved if, as a matter of fact, Einstein did not have in mind, and could not reasonably have expected, death as a result, and if no other reasonable man would have anticipated that death would probably result from his original unlawful act.

7. We do not think any evidence was submitted which, in any view of the case, would have authorized the jury to conclude that Campbell was justified in killing Einstein. Under our law, opprobrious words, however offensive, can not be resented by the use of deadly weapons, nor would the use of deadly weapons be justified in resistance of a mere assault with one's hands. The burden was upon the defendant insurer to establish its defense by a preponderance of evidence, and we do not think that the jury could have found any evidence which would have authorized this conclusion. It is not necessary for us, however, to decide what the jury might have found upon this point, for we base our decision upon the proposition that the evidence wholly failed to show that Einstein's original unlawful act was the prime cause of his death. If his unlawful act was not the cause of his death, his death could not be "the result of a violation of law," within the terms of the policy; and viewing all the evidence most favorably to the insurer, because the verdict was directed, and conceding every inference which the

insurer can raise from the testimony submitted, the defense here set up is precluded because the cause implied from the word "result" must be a cause permitted by law. We are precluded from anticipating a result which the law forbids, and Einstein could not reasonably have anticipated that death would be the result of his unlawful act in using opprobrious words and striking Campbell; and no one else—citizen or juror—could reasonably expect such a result; for the law expressly forbids that death shall be a result ensuing upon this violation of the law. We think, however, that as no witness, at any stage of the difficulty, saw a pistol in Einstein's hand, and as none was found either in his possession or near him after he had fallen helpless to the floor, it would have been impossible for the jury to reasonably find that the wound in Campbell's arm was caused by or due to anything else than himself. Testimony is undisputed that he had his left arm around Einstein's neck; that one of the shots fired by him while in this position grazed Einstein's neck; and the jury could not have reached any other conclusion than that this same bullet, after passing Einstein's neck, entered Campbell's left wrist, which was around it. Under the facts in the record, and the law of Georgia in regard to the use of opprobrious words, there is no view of the case in which Campbell's shooting of Einstein could be held justifiable. If not, it can not be said that Einstein's original unlawful provocation was the prime cause of his death. Furthermore, under our law, no one is permitted to repel by the use of a pistol or other deadly weapon an assault made with the hand alone; so Campbell's shooting of Einstein can not be justified upon the ground that Einstein struck the first blow, when the evidence is plain that this blow was inflicted with nothing but Einstein's hand.

We have said thus much in regard to the matter of justification of an offense of which Campbell might probably be guilty, because this view of the case was argued at considerable length by counsel for both parties; but the true test (to which we have already adverted) is laid down in *Supreme Lodge* v. *Crenshaw, 129 Ga.* 195 (58 S. E. 628, 13 L. R. A. (N. S.) 258, 121 Am. St R. 216, 12 Ann. Cas. 307), that is: Was the unlawful act of the insured the direct, reasonable cause of his death? Was death the result that any reasonable man would have expected to follow, as a consequence

of the acts done by Einstein? We think not, and, therefore, we think the judge did not err in directing a verdict. In the *Crenshaw* case, supra, as is pointed out by Justice Cobb, the husband who discovered Crenshaw in adultery with his wife was not guilty of any offense in slaying him; under our law he had an undoubted right to slay him; and yet the Supreme Court held that Crenshaw's death, though the result of his own unlawful act, would not defeat the collection of the policy; because it was not a result anticipated by him, nor such a result as would necessarily and naturally follow, for while an injured husband, under our law, is excused if he slays the adulterer in the act, still there are many cases in which the adulterer, though detected, is not slain. Upon the same reasoning as that given in the *Crenshaw* case, the case at bar affords a far stronger example of a case in which death could not reasonably have been anticipated; for, while the law excuses the husband for slaying the adulterer, the same law positively forbids the killing of one for the use of opprobrious words, no matter how offensive, or in resentment of a blow, when only the weapons which nature has provided are used.

We think the exact point decided in this case was decided by the Supreme Court of Arkansas in Supreme Lodge of Knights of Pythias *v.* Bradley, 73 Ark. 274 (83 S. W. 1055, 67 L. R. A. 770, 108 Am. St. R. 38, 3 Ann. Cas. 872), a case in which the policy contained a provision in the identical words of the contract now before us; and the reasoning of the court is, to us, convincing, and the conclusion unanswerable. Hill, C. J., in delivering the opinion of that court, says: "It is insisted that, if there is a causative connection between the assault and the death, then the death is the proximate result of the assault. Such reasoning contains the fallacy that an assault will be repelled with more than lawful force. Such is often, perhaps usually, the rule where blood is hot, and the strength sufficient, or the weapon handy enough. But such is not the result to be expected under the law. An assault calls for a repulsion of it by just such force as necessary to overcome it, and more than that is unlawful, and unlawful consequences are not to be presumed to follow the act. When Bradley attacked Morescheimer with a piece of iron, then Morescheimer was justified in overcoming that attack, and, if necessary to overcome it, in taking Bradley's life, and a death resulting while so lawfully resisting the

attack would be the natural result expected to flow from such attack, and there would be a causative connection between the assault and the death; in other words, the attack would then be the cause of the death. . . Therefore, the first violation of the law by Bradley was not the proximate cause of his death, but the subsequent unlawful act of Morescheimer in shooting his retreating assailant was the proximate cause."

We agree that there is a clear distinction between a provision which avoids a policy if the insured is killed in a violation of the law, and one in which there is a stipulation that the full amount of the policy will not be paid if the insured is killed as a result of a violation, and that in the latter case the policy is not collectible if an unlawful act of the insured in the legal sense caused his death. But while the Supreme Court of this State has not had occasion to deal with a policy of insurance containing the precise verbiage employed in the policy now before us, and in the cases which were decided the forfeiture was conditioned upon the fact that the insured should be killed "in the violation of the law," and not, as here, as "the result of a violation of law," still, in several rulings in this State, as well as in other jurisdictions, it is pointed out that the insurer can escape liability only where it is made to appear that the act of the insured was the direct, proximate cause of his death, and also that death was the result which might reasonably have been expected from the unlawful act of the insured.

*Judgment affirmed.*