28573. NATIONAL LIFE AND ACCIDENT INSURANCE COMPANY *v.* SUTHERLAND.

DECIDED NOVEMBER 29, 1940. REHEARING DENIED DECEMBER 17, 1940.

*Y. A. Henderson, Ben Anderson, W. F. Buchanan,* for plaintiff in error.

*J. H. Paschall, R. F. Chance,* contra.

SUTTON, J. Mrs. Lola Sutherland, as beneficiary, brought suit against the National Life and Accident Insurance Company to recover $1000 under a policy of insurance issued on the life of her son, Horace Vaughan Sutherland. The policy insured the life of the son for $1000, but by a supplemental agreement contracted to pay the additional sum of $1000 if the insured should die by reason of bodily injury effected directly or indirectly through external, violent, and purely accidental means, provided, however, that "such death occurs . . while said policy and this supplementary contract are in full force with no premium for either in default, and that the injury causing such death be not . . sustained in connection with violation of law by the insured," etc. The insured, who resided at Calhoun, Georgia, was killed by the wrecking of his automobile, which he was driving on the night of October 16, 1938. The insurance company admitted liability for $1000 on the life of the insured, less a small unpaid portion of premium, but denied

liability under the double-indemnity provision of the policy, setting up that "this defendant shows that it is not liable to the plaintiff for any amount on the supplementary contract insuring the said Horace V. Sutherland against accidental death for the reason that at the time the insured met his death that the same was sustained in violation of the laws of Georgia, in that he was driving his said automobile, according to the information and belief of this defendand, at an illegal rate of speed, that is, in excess of forty miles per hour, and, at the time and place where said car was turned over and brought about the death of said insured, he was driving the same and under the influence of some intoxicant, all of which is a violation of the laws of Georgia and proximately caused the death of said insured." The plaintiff accepted the sum of $1000 without prejudice, and the case proceeded to trial on the claim of the plaintiff as to recovery of the additional amount of $1000 under the supplementary contract hereinbefore mentioned. The exception here is to the judgment of the court overruling the defendant's motion for new trial on the general and special grounds after the return of a verdict by the jury in favor of the plaintiff.

The evidence discloses the following facts: The automobile being driven by Horace Sutherland was traveling north from Calhoun, Georgia, towards Dalton, Georgia, and the wreck occurred about two miles north of Calhoun on U. S. Highway No. 41 on a curve in the asphalt paved highway, the curve being to the left and slightly upgrade to a bridge over railroad tracks. The evidence established that the automobile cut sharply to the left or inside of the curve, the left wheels getting off the pavement and traveling a few feet along the shoulder of the road, and the car then being cut to the right and on the pavement, upon which it turned over, a complete revolution sideways, and landed on its four wheels, facing east across the highway, the wreck occurring about 10:30 o'clock at night. All occupants of the car were thrown out and severely injured. The driver and two others died, but the fourth, a young lady, survived her injuries. The automobile was badly damaged, all fenders crushed, the glasses broken out, the running parts bent, and the top torn out and the doors jammed.

■ The plaintiff in error contends that under the evidence, more of which will be referred to hereinafter, the plaintiff was not entitled to recover, inasmuch as it was shown that the death

of the insured was sustained in connection with a violation of law by the insured in two respects, (1) driving an automobile while under the influence of an intoxicant, and (2) driving at a rate of speed in excess of forty miles an hour, the limit prescribed by statute at the time of the wreck, and that there was a causal connection between the death of the insured and the violation of the law, thus exempting the company from liability under the policy and the law. The defendant in error contends that for the company to be exempt from liability the death of the insured must have been the proximate result of the violation of law, and that it was a jury question whether the death of Sutherland was proximately caused by a violation of the law or by the blowing out of a tire of the automobile driven by the insured.

Before discussing the evidence on the question of a violation of the law, it is deemed pertinent to examine the law as to exemption from liability of the defendant under policy provisions similar to those here involved. Insurance companies, realizing that unusual dangers are usually associated with violations of law, and that they do not menace other citizens who do not engage in such violations, insert such provisions in policies to protect themselves against such increased hazards. In 6 Couch Cyc. of Ins. Law, § 1236, it is stated as to death or injury in violation of law: "The fact that an insured came to his death while violating the law does not absolve the insurer from liability, unless the policy so provides, or was obtained in contemplation of the commission of crime. But a condition avoiding a policy or benefit certificate if the death of the insured shall occur in consequence of any violation, or attempted violation, of law, is reasonable, and may lawfully be inserted in a contract of insurance. Nor is there any doubt that, where an accident policy exempts from liability for injuries resulting from accident while insured is violating any law, there is no liability where the accident was a direct consequence and result of the violation of the law. It has been decided, however, that a provision in an accident policy that the insurance will not cover death while the insured is engaged in any unlawful act will not absolve the insurers from liability, unless it appears that the natural and reasonable consequence or effect of such violation of the law is to increase the risk. In other words, a provision exempting from liability where death results from a violation of the law

means death directly and proximately resulting therefrom. And there is much authority to the effect that the mere fact that the accident occurred while the insured was engaged in a violation of the law does not exonerate the insurer, but, to avoid liability, it must further establish that the violation of law was the cause of, or had some causative connection with, the accident, although there are well-considered cases laying down a much broader and less restricted rule."

In 6 Cooley's Briefs on Insurance, 5215, the rule is stated: "Whether the law violated be a criminal or a civil law, there must in all cases be some causative connection between the act which constituted the violation of law and the death of the insured." On page 5217 of the same volume it is stated: "Not only must there be a causative connection between the violation of law and the death, but such connection must be direct, and not indirect; proximate or immediate, and not remote." Under the last statement the eminent authority cites, among other cases, *Empire Life Insurance Co.* v. *Einstein,* 12 *Ga. App.* 380 (77 S. E. 209). In that case the policy provided that liability should be limited to the return of premiums paid, with interest, "if the insured shall, within one year from the date hereof, die *as a result of* a violation of the law." (Italics ours.) The insured was killed by one to whom he had used opprobrious words. The court held that the killing was not the result that any reasonable man would have expected to follow as a natural and proper legal consequence of the conduct of the insured, as the law will not justify a killing in resentment of opprobrious words, and that the insured did not die "as the result of a violation of the law." Under the circumstances shown it was held that the court did not err in directing a verdict for the plaintiff. In *Sovereign Camp Woodmen of the World* v. *Keen,* 16 *Ga. App.* 703 (3) (86 S. E. 88), the court held: "A provision in a benefit certificate, that it shall be void if the person whose life is thereby insured 'should die . . in consequence of the violation or attempted violation of the laws of the State,' will not bar a recovery where his death was not the direct, natural, and legally proximate consequence of a violation of law on his part." These cases establish that if the policy provides that the insurer shall not be liable if the insured die as a *result of* or *in consequence of* a violation of law by him the insurance company would not be

exempted from liability unless his violation of law was the proximate cause of his death.

The provision in the present policy, however, is broader than the policy provisions which were involved in the cases above mentioned, in that it provides that the company shall be exempt if the insured's death is sustained *in connection with* a violation of law by the insured. No nicety of definitions is necessary to demonstrate that, if the insured at the time of his death was under the influence of an intoxicant while driving, or was driving his automobile in excess of the limit of speed prescribed by law, considerations hereinafter to be dealt with, his death was *in connection with* a violation of law. But the question is presented: Is the insurance company exempted from liability by showing that the insured's death was *in connection with* a violation of law, or must it go farther and show that his dereliction was the *proximate cause* of his death? In 1 C. J. 457, § 145, it is stated: "Accident-insurance policies usually contain a provision whereby the insurance is not to extend to injuries caused by or while, or in consequence of, violating the law. . . In order to relieve the insurer of liability the insured must have been actually engaged in a violation of law at the time of the injury, and the injury or death must be shown to have resulted from the act which is claimed to be unlawful, or at least to have had a causative connection therewith, but it is sufficient that the violation of law is a conditional or remote cause of the injury, and it is not necessary that the offense which the insured was attempting to commit should be consummated." In 29 Am. Jur. 692, § 906, it is stated: "Not infrequently policies provide that no recovery shall be had thereunder in case of death *while engaged in* or in consequence of a violation of law, or the commission of a crime. Such a provision is valid and enforceable, but it is usually held that to render such a provision pertinent *there must be some causative connection between the unlawful act and the death of the insured.*" (Italics ours.) An act may contribute to or have some causative connection with the death of an insured and yet not be the sole proximate cause, and the above authorities show that some act of the insured, less than the *proximate* cause of his death, may be sufficient to exempt the insurance company from liability under a policy containing a provision similar to that in the present case.

The exact language of the policy herein dealt with has not been considered by the appellate courts of this State. However, in *North Carolina Mutual Life Insurance Co.* v. *Evans*, 38 *Ga. App.* 178 (143 S. E. 449), a somewhat similar provision was before this court, and it was held: "Where an action is brought on a life-insurance policy providing that the insurance company 'shall not be liable for death occurring *while in the commission of,* or as a punishment for, *some act in violation of any law,* . .' and the defendant pleads that the death of the insured resulted from his unlawful conduct in pointing his pistol at his slayer and precipitating the difficulty in which he was slain, and the uncontradicted evidence sustains the plea, there can be no recovery. (*a*) Stipulations like the one set out must be construed reasonably, and the insurance company is not absolved from liability unless the death of the insured is the reasonable and legitimate consequence of the unlawful act." Death following the pointing of a pistol towards another might reasonably be expected as to the offender, and the court regarded the death of the insured in the *Evans* case as the "reasonable and legitimate consequence" of the unlawful act. The provision there involved was somewhat broader than that in the present case, and the test as to nonliability of the insurance company, as there announced, does not go so far as to require that the act of the insured be the sole cause or proximate cause of his death.

A consideration of *Supreme Lodge* v. *Crenshaw,* 129 *Ga.* 195 (58 S. E. 628, 13 L. R. A. (N. S.) 258, 121 Am. St. R. 216, 12 Ann. Cas. 307), is of benefit in examining the question at issue. In that case the policy provided that "if death is caused or superinduced at the hands of justice, or *in violation of* or attempt to violate any criminal law" (italics ours), the insurer would not be liable for the full amount of the policy, but only for an amount to be computed according to a mode prescribed in the policy. The insured was slain by a husband, either while he was attempting to have sexual intercourse with the wife, or immediately after the act of sexual intercourse was complete. The court held "that the death of the husband was not caused or superinduced in the violation of, or attempt to violate, any criminal law, within the meaning of the policy as properly interpreted," reaching its conclusion by reasoning that "one who commits the offense of adultery with a married woman well knows that his life is imperiled if the

outraged husband take the guilty pair in the unlawful act, or at its beginning, or at its conclusion; but it can not be said, as a matter of law, that the killing of the adulterer is the natural and legitimate consequence of the illicit intercourse between him and the wife of the wronged husband. Death may result, but it can be no more said that the death of the adulterer at the hands of the husband is the reasonable and legitimate consequence of the act of adultery than it can be said that the death of a felon at the hands of an arresting officer is the reasonable and legitimate consequence of the felony committed." The court does not, however, lay down any rule that the violation of law by the insured must be the *proximate* cause of his death but says: "It is deducible, from the authorities, that a stipulation of the character now under consideration must be given a reasonable construction, and that the liability of the company is not to be discharged unless the violation of the law consisted in an act of which the death of the insured was the reasonable and legitimate consequence. If the insured does an act which is a violation of the law, and which he knows puts his life in peril at the time that he commits it, the company is not liable under a policy containing a stipulation of the character now before us. But there must be something in the act itself, independent of other circumstances, which makes the death the reasonable consequence." The court concludes: "There is nothing in the crime of adultery, although a violation of the law of the land and a great moral wrong, which, in its essence, is calculated to produce the death of the adulterer. Under some circumstances it may be the occasion of the death of the adulterer, but his death is not then the natural and legitimate consequence of the adultery itself." We think that under the *Crenshaw* case and the rule announced in Corpus Juris and American Jurisprudence, supra, the insurance company is exempted from liability if it is shown that the insured was engaged in a violation of law, not necessarily the proximate cause of his death, but one which had some causative connection with his death, or from which the death of the insured was a reasonable consequence. An examination will now be made as to whether or not the insured was violating any law at the time of his death, and whether or not his death was sustained in connection therewith or, as contended by the defendant in error, from an independent cause, the blowing out of one of the tires on the automobile.

■ The voluminous evidence on the question of the condition of Sutherland and the manner in which he drove his car, together with other pertinent circumstances, may be summarized as follows: Sutherland, with another young man and two young ladies, visited a store at Calhoun about twenty-five minutes before the fatal wreck. According to the uncontradicted testimony of the storekeeper, each of them except one of the young ladies took a drink of whisky in his presence. One of the young ladies spoke to him about Sutherland's drinking, and requested him to "drink up" what remained in the bottle because Sutherland "was driving a little bit fast." He was asked "if I would carry them back if he wouldn't quiet down and drive right." He told the young lady that he could not do so because he did not have an automobile, but that if "they didn't go back with him we would try to get them back some way." Thereafter an automobile was observed by two State patrolmen to hurriedly and recklessly drive away from a filling-station or garage in Calhoun. As soon as they could turn their car around they pursued the other car at high speed. Both cars passed through two red lights. The patrolmen testified that up to the time of the wreck no other car was between them and the car they were chasing. They traveled, after leaving the city, at a speed of seventy to eighty-five miles an hour, but did not overtake the other car until it was wrecked about two miles from the city. Upon reaching it they found Sutherland and his companions, all of whom had been thrown from the car. His young man companion and one of the young ladies were dead. Sutherland, on the following morning, died in a hospital as the result of his serious injuries. The other young lady, though severely injured, finally survived.

It is contended by the defendant in error that, inasmuch as the patrolmen, after meeting the Sutherland car in Calhoun, had to travel a short distance before turning around and pursuing it, it does not follow that to reach the point where the car was wrecked Sutherland necessarily exceeded the legal rate of speed, which at the time was forty miles an hour. Code, § 68-301. But it is established by the testimony of two unimpeached witnesses that at a point about 400 yards south of the scene of the wreck the car which was wrecked in a brief interval thereafter was traveling at eighty to eighty-five miles an hour. It was shown by the evidence that the car, as it approached a bridge, unmistakably was cut

sharply to the left and then suddenly to the right, its course being indicated by the reflection of its lights upon trees on the side of the highway, whereupon it turned over, making a complete revolution, and landed upright on its wheels, facing eastward of the highway upon which it rested. Without mentioning other circumstances supporting our conclusion, it must be held as a matter of law that at the time of the wreck the insured was violating the speed law of this State. Hence, his death was "sustained in connection with violation of law," the language used in the policy, and certainly this transgression had a causal connection with the death of the insured. Why Sutherland drove his car so rapidly does not conclusively appear. As stated, there was testimony that he took one drink of whisky in the presence of a storekeeper twenty-five minutes before the wreck. From statements made to this witness it is inferable that he had been drinking before he arrived at the store. Certainly he was under the influence of an intoxicant while driving his automobile and thereby violating the law. It is a violation of the law to drive an automobile upon the public highway "while under the influence of intoxicating liquors or drugs." Code, § 68-307. To sustain an indictment under this section "It is not necessary for the State to show that the accused was drunk, but it is sufficient if the State shows, beyond a reasonable doubt, that the accused was under the influence of some intoxicant as charged, to any extent whatsoever, whether drunk or not." *Chapman* v. *State*, 40 *Ga. App.* 725 (2) (151 S. E. 410); *Hall* v. *State*, 58 *Ga. App.* 398 (198 S. E. 713). There was testimony by two witnesses on behalf of the plaintiff that they did not smell any odor of whisky about the insured at the scene of the wreck. Two others testified that they did not detect any such odor about him at the hospital. They were more or less near to the body. However, all of the testimony was negative in character, it not being shown that there was any effort made to detect an odor of whisky or that their attention was directed to the question of his condition in that respect. This testimony being circumstantial, and perfectly consistent with the direct, reasonable, and unimpeached direct and positive testimony of the storekeeper that Sutherland had in fact taken at least one drink, can not establish as a fact that he was not under the influence of an intoxicant. A finding is demanded, as a matter of law, that he was so

influenced, and whether or not his condition may have set aside caution and judgment, the single fact of driving an automobile on the public highway at an unlawful rate of speed is sufficient of itself to sustain the defense that the insured, at the time of his injury, was engaged in a violation of the law which the facts show had a causal connection with his death.

But it is contended by the defendant in error that, even though he was engaged in a violation of the law, the actual, efficient, and proximate cause of the death of the insured was the blowing out of a tube in the left-rear tire of the automobile. The tires and tubes were new. After the wreck a part of the tube was found to be protruding between the tire and the rim with a two-inch split in it. The tube was not "chewed up," as would, according to the evidence, result if the tire had been traveling on its surface for any appreciable distance. There was much testimony as to the possibility of a blow-out at forty miles an hour and at eighty miles an hour, and the resulting effect upon an automobile having its tire thus damaged. Although several witnesses heard the noise produced by the car in its act of turning over on the highway, and there were two who were within 400 yards of the scene of the wreck, none heard any sound of a blow-out preceding the sharp turning of the car hereinbefore described. There was uncontradicted testimony that in the manner the car turned at its high rate of speed the tire would likely be pulled away from the rim and allow the tube to protrude and split. There was no evidence that the tire itself had blown out. While there were two witnesses for the plaintiff who, after seeing the location of the wreck etc., testified that in their opinion the blow-out of the tube caused the overturning of the car, still it must be said that the reckless and unlawful driving of the automobile contributed to and had a causal connection with the death of the insured. The witnesses above mentioned had no knowledge of the speed at which the car was being driven. One of them, a garage man, testified that he found a split in the tube after the car had been taken to Calhoun; that it was possible the split could have been caused in moving the car; that "I wouldn't say that it [an automobile] wouldn't turn over going thirty miles an hour. . . As to whether or not a car going forty miles an hour would turn over on its side and then turn back, and then turn on the other side and back on its wheels, I

wouldn't say. That is pretty technical. . . I didn't find the tube chewed up, and the tire was not chewed up. . . The only thing I found wrong with this tube was a split, possibly two or three inches long. . . I don't know what speed the car was going, nor do I know whether the speed contributed to the blowing out of the tire [tube] or not. . . This car when it started turning over could have caused the tube to blow out on one side of the tire. . . Yes, it is true that a car running at eighty miles an hour is more apt to have a blow-out than a car running forty miles an hour. . . Assuming that it was going eighty miles an hour, anything is liable to happen; it is possible for a tire to blow out, and it is possible for it to turn over, and it is liable to blow out a tire in turning over."

Gene Sutherland, a witness for the plaintiff, testified that he saw the car before it was moved from the scene of the wreck, and that the tire on the left front wheel was flat, and that from the marks on the highway he "figured," it was his opinion, that a blow-out caused the car to overturn, but did not know how fast the car had been traveling. While neither of these witnesses went so far as to assert that a car going at a legal rate of speed would, in case of a blow-out, do more than overturn on its side, Joe Richardson, another garage man, testified for the defendant that "going at forty miles an hour and have a blow-out, it would probably throw it sideways, but won't throw it completely over. In my opinion, it would have to be going not less than sixty miles an hour, between sixty and seventy miles an hour, for it to turn a complete revolution." Another witness, a dirt-track champion automobile racer of the Southeast, a stunt driver and "daredevil," making his living in large part by overturning cars at State fairs and on other occasions for the delectation of spectators, testified that, from an examination of the scene of the wreck and his experience in intentionally overturning cars at high speed and otherwise, in order for an automobile to turn over and make a complete revolution and land back on its wheels, it would have to be traveling at a speed of not less than sixty miles an hour. As already pointed out, the car, immediately prior to the wreck, was, by uncontradicted testimony, traveling at eighty to eighty-five miles an hour, and its dilapidated condition after its catapulting gave mute testimony of the excessive speed at which it was propelled. To say that the car

was not being driven at a rate of speed in violation of the law and that such violation of law had no causal connection with the death of the insured would, in our opinion, be to indulge in the merest imagination and run counter to the dictates of reason. The court erred in overruling the general grounds of the defendant's motion for new trial.

Several special grounds of the motion for new trial, assigning error on certain portions of the charge of the court, are controlled by what is ruled in the first division of this opinion, and any detailed discussion is deemed unnecessary.

*Judgment reversed. Felton, J., concurs.*

STEPHENS, P. J., dissenting. Under the evidence as narrated I can not conclude that it appears as a matter of law that at the time of the accident the deceased was violating the law, either in the operation of the car at a rate of speed in excess of that permitted by law, or in operating the car while under the influence of intoxicating liquor. Nor can I conclude that as a matter of law any such violation of the law by the deceased bore any causal relation to the accident. It appears that there was a blow-out at the time of the accident. It is inferable that this, independently of any violation of law by the deceased, caused the death. I do not concur in the conclusion that the evidence demanded a verdict for the defendant.