25818. PAN-AMERICAN LIFE INSURANCE CO. *v.*
BAGLEY.

DECIDED MARCH 16, 1937. REHEARING DENIED MARCH 31, 1937.

*Wilson, Bennett & Pedrick, Bryan, Middlebrooks & Carter, John
A. Dunaway,* for plaintiff in error.

*Herbert W. Wilson,* contra.

MacINTYRE, J. Mrs. Kathleen Bagley, the beneficiary under a policy of insurance issued by Pan-American Life Insurance Company on the life of her husband, Daniel E. Bagley, sued the insurer for $2000 alleged to be due her under the double-indemnity provision of the insurance contract. The jury returned a verdict against the insurer for $2000. The exceptions are to (1) the judgment overruling the general and special demurrer to the petition as amended, and (2) the judgment overruling the motion for new trial. The allegations of the petition as amended, which are deemed material to the questions at issue, are substantially as follows:

"2. That . . defendant has injured, damaged, and is indebted to your petitioner in the sum of . . $2000, . . besides interest at seven per cent. per annum, arising on the following state of facts. 3. That Daniel E. Bagley . . contracted with the defendant . . for a policy of life insurance . . for . . $2000, . . wherein your petitioner was named as beneficiary, said policy being issued on or about December 5, 1928; a copy of said policy is not attached hereto, for the reason that same is in the possession of said defendant, . . but petitioner demands that said original policy be produced in court. . . 4. That attached to said policy is a rider wherein the defendant

company agreed to pay your petitioner as the beneficiary named in said policy *double indemnity* upon receipt of due proof that the death of the insured occurred in consequence of bodily injuries solely through external, violent, and accidental means; a copy of said rider for double indemnity . . being as follows: 'On receipt of due proof that the death of the insured occurred in consequence of bodily injuries effected solely through external, violent, and accidental means, of which . . there is a visible contusion or wound on the body, and that such death occurred within sixty days after such injury was sustained, and as a direct result thereof, independently of any other cause, provided premiums have been duly paid, and that this policy is then in force for its face amount and is not running on extended or paid-up insurance, and no payment under the total and permanent disability provision has been made, the company will, upon the surrender of the policy pay to the beneficiary . . under this policy . . double the face amount of the policy. It is mutually agreed that this provision shall not cover . . death resulting . . from bodily injury inflicted by the insured himself, or intentionally by another person.' . .

"5. Petitioner shows . . that on the night of December 9, 1933, her husband, the said . . Bagley, drove out to the business of Roe Murray, said business being located in Pierce County, Georgia, on the Oglethorpe Highway running from Waycross, Georgia, to Savannah, Georgia; and while standing at the counter of said business, without any warning whatsoever, one Byron Phillips opened the front door of said business and began shooting a shotgun in the direction of Roe Murray, the proprietor of said business, and Daniel E. Bagley, being an innocent bystander in said business, was wounded and from said wounds died. 6. Petitioner avers that the injury sustained by her said husband was not the result of misconduct or participation by him, but was unforeseen by him; that said injury on account of said shooting which caused the death of the said Daniel English Bagley was unforeseen, unexpected, and unusual, and said injury and death as aforesaid was caused directly, solely, and exclusively through external, violent, and accidental means. 7. That on the following day, December 10, 1933, the agent and representative of the defendant company, W. G. Townsend, called at the home of peti-

tioner and stated that her husband, Daniel E. Bagley, held a policy with the defendant company for . . $2000, . . and his company was ready to pay her . . $2000, . . and within a week or ten days thereafter he settled said policy with her, stating at the time that she was only entitled under said policy to . . $2000. 8. Petitioner avers that up to the time of said settlement she had never been in possession or had never seen said policy, but that same was kept at the business where her said husband was employed, and she never knew nor had opportunity to know the contents of said policy up to the date of said settlement; that said representative was in possession of said policy and did know the contents of same. 9. That on the day following the death of her . . husband she was in a highly nervous state of mind and continued so for months thereafter, and petitioner reposed special confidence in the said W. G. Townsend, . . and believed at the time that he was telling her the truth when he told her that she was only entitled to . . $2000, . . and in so believing him she settled said policy for . . $2000. That the amount sued for represents the double indemnity which said policy carried; that said double indemnity was not included in said settlement when the face of the said policy was paid by the defendant as set forth herein. 10. Petitioner avers that for several months after said settlement she did not know that the policy contained a rider for double indemnity in case of accident, and that she would not have known it up to this time had not a friend told her that she was entitled to . . $4000 . . instead of . . $2000 by reason of the death of her husband, and she immediately took the matter up with the defendant company through her attorney, but they have declined to pay her what she is justly entitled to. 11. Petitioner alleges that the agent and representative, W. G. Townsend, of the defendant company, failed to make a full disclosure of the contents of the double-indemnity rider attached to said policy, he knowing that the policy contained such rider, but only informed her as to the main policy which was only for . . $2000, . . and by so doing deceived petitioner and obtained her receipt in accord and satisfaction of said policy by fraud. Petitioner relied upon said representations and was deceived thereby. 12. Petitioner avers that the defendant, through its representative, knew said representations were false

when he made them, and petitioner did not know they were false, but believed them to be true; that said representative of defendant company well knew that said policy contained a rider calling for double indemnity in case of death caused by external and violent means, and that petitioner was entitled to double indemnity by reason of the death of the insured as set forth herein, and on account of the fact that the said representative of defendant company did not divulge this fact to petitioner at the time of said settlement he procured said settlement by fraudulent means; and as a result of such conduct on the part of the defendant company through its said representative, the receipt obtained from petitioner in full accord and satisfaction of said claim is null and void."

The demurrer, follows: "1. The petition sets forth no cause of action. 2. The petition shows on its face that the death of the insured . . was caused by injuries intentionally inflicted by another, to wit, Byron Phillips. 3. Paragraph . . 5 of the . . petition should be stricken, because it does not allege: (a) that the death of Daniel English Bagley was not caused by intentional injuries inflicted by another person, and (b) it does not allege specifically whether or not Byron Phillips shot the insured . . intentionally."

1. While we are inclined to the opinion that fraud is sufficiently pleaded in this case to withstand the attack of the demurrer, still we prefer to plant our ruling on the ground that there was no consideration for the "settlement." Of course, like any other contract, an accord and satisfaction must have a consideration, and it unequivocally appears from the petition that the face value of the policy was liquidated, undisputed, and promptly paid by the insurer. We think the well-considered decision in Buel v. Kansas City Life Ins. Co., 32 N. M. 34 (250 Pac. 635), follows the true rule. The similarity of that case to the one at bar appears from the following statement at the beginning of the opinion: "Appellee was the beneficiary in an insurance policy issued by appellant upon the life of appellee's son, in the sum of $2000. Attached to the policy was a double-indemnity rider, providing that 'If . . the death of the insured . . should result from the effects of an injury, through external, violent, and accidental cause, the amount payable herein will be $4000.' . .

Proofs of loss having been furnished, appellant forwarded a draft for $2000, which appellee accepted, surrendering the policy and signing the printed receipt thereon to the effect that she received said $2000 in full of all claims whatsoever under the said policy, and in consideration of said sum surrendered all her right, title, and interest in and to the same, and forever released appellant from all liability to her thereunder. . . No fraudulent representations were made whereby the appellee was induced to execute the release and surrender the policy." We quote further from that decision, as follows: "Where a part of a claim is conceded, and a part is in dispute, the authorities differ whether payment of the part conceded, received in discharge of the whole, is good accord and satisfaction. . . So long as we adhere to the general rule that part payment of a liquidated or undisputed demand is not accord and satisfaction, we hesitate to accept the doctrine that payment of the conceded part of a claim is consideration for a release of the balance which is in dispute. . . In the case at bar it can not be questioned that the parties agreed, by the policy, upon the amount of the indemnity. There never was dispute as to liability for $2000 because of the death of the insured. There was dispute as to any liability for accidental death, but none as to the amount to be paid if the death were accidental. By the payment made, appellee obtained nothing to which she was not entitled, and appellant gave up nothing it could rightfully retain. If the claims were to be considered separately, the death claim was liquidated and undisputed; the accident claim liquidated and disputed. If it be treated as a whole, the larger amount was liquidated, and the smaller amount paid was conceded. However viewed, we find it impossible to locate the consideration for the release of the amount here sued for." The Buel decision is supported by the numerous authorities cited therein, and is, we think, sound in principle. See also American National Ins. Co. v. Reed, 26 Ala. App. 350 (3). We are also of the opinion that, as against the demurrer, the petition sufficiently alleges that the death of the insured resulted from "bodily injuries effected solely through external, violent, and accidental means." We hold that the court properly overruled the general demurrer. The special demurrers are not meritorious.

2. The first ground of the amendment to the motion for new

trial is an elaboration of the general grounds and needs no separate consideration. The remaining three special grounds assign error upon different excerpts from the charge of the court. They present no new or interesting question, and disclose no reversible error.

3. In considering the general grounds of the motion for new trial, we shall first state that our view is that the evidence supports the conclusion that the alleged accord and satisfaction was entirely without consideration. Therefore we hold that there was no settlement of the plaintiff's claim under the double-indemnity provision of the insurance contract. The defendant specifically pleaded the exception under the double-indemnity provision of the policy. After stating in their brief that "there is no dispute . . that Daniel Bagley met his death as a result of injuries inflicted by another by external and violent means," counsel for the plaintiff in error proceed to state, in the following language, the two very important questions next to be considered: "One of the questions in the case is whether or not, within the meaning of the policy, *death was the result of accidental means;* and another question is did his death result in such a way and from such a cause as to come within the exception that the company is not to be held liable for the double-indemnity in case *death resulted from bodily injury intentionally inflicted by another."* (Italics ours.) It appears from the evidence that Daniel E. Bagley, the insured, was killed on the night of December 9, 1933, at Roe Murray's place on the Blackshear road. The front room appears to have been a lunch-room. Toward the far side of it from the front door was a counter. At the back of the lunch-room was a partition separating it from the dance-hall beyond, and at about the center of this partition was a window. When Byron Phillips entered the front door of the lunch-room and began firing an automatic shotgun, Bagley and Murray were standing near each other, a little to the right of a line drawn from the front door to said window, and W. S. Corbett and one Pead were standing at said window. There were others in the building. We quote as follows from the testimony of W. S. Corbett, the only witness who was at the scene of the tragedy: "Me and Pead, who got killed, . . were standing up at a window, and just as we got to the window some fellow came in there and started shooting.

. . I seen him when he fired the first shot, and I ducked back of the victrola and stayed . . there until it was over. The front door of Roe Murray's place was straight in front of me where I was standing at the window. . . Frank Pead, the boy that got killed, was in the window with me. The window was . . exactly in front of the front door. Mr. Murray was standing to the left of the window towards Blackshear. Mr. Bagley was standing across the counter. . . I saw the party who opened the door. The front door was just kicked open and slammed back. When he did that he pointed the gun kinder in the direction of Mr. Murray and Mr. Bagley—right in the direction of both. . . Immediately after kicking the door open he started shooting; throwed his gun up and started shooting. . . The main door was open, but the screen door was closed. The first shot was fired in the direction of Mr. Murray and Bagley. I don't think either was hit. . . The shots went above the counter, and went back in the partition. That was to the right of Mr. Bagley. Mr. Murray was to his left. . . The first shot was not the shot that hit Mr. Pead. The shot that hit Mr. Pead must have been the second shot. . . Manning and Pead must have been hit on the second shot. I didn't see anything after the first shot. . . There wasn't anything between whoever was doing the killing and Mr. Bagley; it was an open space. . . Pead and I were standing back in the dance-room. . . The screen door opened on the inside at the end of the room toward Waycross. . . As he [the assassin] came in I seen him raise the gun. I saw the door open and the gun come up in a shooting position. He did not wave it back and forth, side to side; he just raised it up and shot just from raising. . . The first shot missed both Mr. Bagley and Mr. Murray. It passed closer to Mr. Bagley than . . to Mr. Murray. . . The moment the first shot was fired I saw Mr. Murray . . fall over down behind the counter. I didn't see Mr. Murray . . until after it was all over. . . When he [Frank Pead] was shot by the second shot he was going out the back door. . . I know the second shot went through that window and hit Frank Pead and Lawrence Manning. There was no other person . . in that front room where the business is done, and where the counter is, besides Mr. Murray and Mr. Pead and the man with the gun. When Mr.

Murray fell down behind the counter, that left Mr. Bagley and the man with the gun in that room by themselves between the counter and the door. After the second shot was fired that came into the back room and shot Frank Pead and Lawrence Manning, there were three other shots, and it was either one or more of those shots which wounded Mr. Bagley and caused his death. I heard scuffling going on. It must have been Mr. Bagley and the fellow doing the shooting who were doing the scuffling. I mean by that there were only two out there and there was scuffling. I did not see the scuffling. Just before the scuffling, I saw Mr. Roe Murray fall down behind the counter. The counter had a ceiled bottom between where Mr. Roe was and where the man was that had the gun. You can't stand on the outside of the counter where the gunman was, when a man falls behind that twenty-foot counter, and see behind there and see where he is. . . It was about six or eight feet from the front door to where Mr. Bagley was. I don't remember whether I testified before the door slammed in on his arm when he raised the gun." Hubert Ulmer testified, in part, as follows: "The wound that killed him [Bagley] was right here in the groin, and severed an artery and vein in his leg, the right leg, a little in the side. . . the bullet which . . in my opinion killed him went in from the front, . . apparently at the time that buckshot went in. The left side of Mr. Bagley was slightly closer to the assassin than his right side. . . From the location of the wound I would say he was shot with a shotgun. . ."

The double-indemnity provisions of the insurance contract have been fully set out in paragraph 3 of the petition. The material part of it relating to accidental death provides for the payment of "double the face amount of the policy" if "the death of the insured occurred in consequence of bodily injuries effected solely through external, violent, and accidental means." The next paragraph of the rider provides that "it is mutually agreed that this provision shall not cover . . death resulting . . from bodily injury inflicted by the insured himself, or intentionally by another person." "Where one person injures another, and the injury is not the result of misconduct or provocation by the injured person, but is unforeseen by him, it is as to him an accident within the meaning of an accident policy insuring him against

618

bodily injuries effected through external, violent, and accidental means." *Newsome* v. *Travelers Insurance Co.*, 143 *Ga.* 785 (85 S. E. 1035). See also *Travelers Ins. Co.* v. *Wyness*, 107 *Ga.* 584 (34 S. E. 113); *Travelers Ins. Co.* v. *Newsome*, 147 *Ga.* 608 (95 S. E. 4). To make the defense good it was necessary that the evidence show that the shooting of Bagley was intentional. Whether the jury concluded that the assassin's conduct indicated that he was incapable of forming an intent, or whether they thought that Bagley was attempting to take the gun away from the assassin and was accidentally and unintentionally shot in the scuffle, we can not say. However, we do think that the jury was warranted in concluding from the evidence that the insured's death resulted from "bodily injuries effected solely through external, violent, and accidental means," and not from "bodily injury inflicted by the insured himself, or intentionally by another person." Without going further into the evidence, we shall state that in other respects the plaintiff proved his case. We hold that the court did not err in overruling the motion for new trial.

*Judgment affirmed. Guerry, J., concurs. Broyles, C. J., dissents.*

BROYLES, C. J., dissenting. I think the evidence demanded a finding that the insured's death resulted from bodily injury intentionally inflicted by another person. This being true, under the double-indemnity agreement attached to the policy, to wit, that "it is mutually agreed that this provision [as to paying double the face amount of the policy] *shall not cover . . death resulting . . from bodily injury inflicted . . intentionally by another person*" (italics mine), the plaintiff was not entitled to recover double indemnity, and the verdict was contrary to law and the evidence.