.28600.  RIGGINS *v.* EQUITABLE LIFE ASSURANCE
SOCIETY OF THE UNITED STATES.

DECIDED MARCH 21, 1941.  REHEARING DENIED APRIL 4, 1941.

*James W. Smith, Fraser, Irwin & Latimer, DeLacey Allen,* for
plaintiff.

*Dudley Cook, MacDougald, Troutman & Arkwright,* for defend-
ant.

MACINTYRE, J.  Mahala Riggins, mother of the insured and
beneficiary under the policy of insurance in question, brought suit
on said policy for the double indemnity, the insurance company
having paid for death from natural causes, and this claim being
under a provision for double indemnity if death or loss resulted
"directly and independently of all other causes from bodily injuries
caused solely by external, violent, and purely accidental means,
provided such loss shall have occurred within ninety (90) days
from the date of the accident."  At the close of the evidence both
the plaintiff and the defendant moved for a directed verdict.  The
judge directed the verdict for the defendant, and the plaintiff ex-
cepted.  The defendant contends that it is not liable on the acci-
dental-death feature of the policy, because the evidence demanded
a finding that it was exempted from liability for accidental death
by the following exception contained therein: "The insurance
under this policy shall not cover accidental injury, death . .
caused directly or indirectly . . by participating in or in con-

sequence of having participated in the commission of an assault or felony." The question here presented is whether, under the evidence, this court can say as a matter of law that the insured was committing "an assault" on the person who killed him (his wife) at the time he was killed. There can be no accident, as a matter of law, without existence of a fact or facts pointing to death through accidental means. It is incumbent upon the plaintiff to show that in the act or acts which preceded the injury alleged to have caused the insured's death something unforeseen, unexpected, or unusual happened. The test seems to be: Did the insured appreciate that by doing the act he was putting his life and limb in hazard? Tabor *v.* Commercial Casualty Insurance Co., 104 W. Va. 162 (139 S. E. 656, 57 A. L. R. 971). Thus, even though his death might be considered accidental under the general accident clause in the policy, nevertheless if his death was caused by an "assault or felony," as stated in the policy, he could not recover. Generally speaking, under a life-insurance policy a prima facie case in favor of the plaintiff's right of recovery is ordinarily established by proving and introducing the policy and proving the fact of death and notice thereof to the company. 37 C. J. 635. However, under a life-insurance policy with an accident feature, in order to make out a prima facie case solely under the accident feature there must be proof of the policy, proof of death, and further proof that the death occurred from accident or accidental means as defined in the policy. *New York Life Insurance Co. v. Jennings,* 61 *Ga. App.* 557, 559 (6 S. E. 2d, 431); *Gaynor v. Travelers Insurance Co.,* 12 *Ga. App.* 601 (77 S. E. 1072); *Georgia Life Insurance Co. v. McCranie,* 12 *Ga. App.* 855, 863 (78 S. E. 1115). In the instant case, the burden was on the plaintiff to prove that the death resulted "directly and independently of all other causes from bodily injuries caused solely by external, violent, and purely accidental means;" this being the definition of accident contained in the policy.

In *Gresham v. Equitable Accident Insurance Co.,* 87 *Ga.* 497, 505 (13 S. E. 752, 13 L. R. A. 838, 27 Am. St. R. 263), our Supreme Court quoted approvingly from Harper *v.* Phœnix Insurance Co., 19 Mo. 509, as follows: "Unless it is otherwise stipulated, the insurer takes the subject insured with his flesh and blood and passions; the dangers to which the lives of men are exposed from sud-'

den ebullitions of feeling are a lawful matter of insurance." But in the policy now under consideration the company has otherwise stipulated, and there is a clause, under a provision of the policy designated as "Limitations," a provision of which is that the insurance should not cover, among other things enumerated, death while the insured was "participating in or in consequence of having participated in the commission of an assault or felony." This exception the defendant sought to invoke, and the burden was then shifted to the defendant to show, as pleaded by it, that the death of the insured was brought about under circumstances which came within the exception to the double-indemnity feature of the policy. *New York Life Insurance Co.* v. *Jennings,* supra, 560; *Travelers Insurance Co.* v. *Wyness,* 107 *Ga.* 584 (2) (34 S. E. 113). In a case like this, before a verdict for the defendant can properly be directed, the evidence must not only support the inference that the person charged with the killing killed the insured, as contended by the defendant, but must also exclude any other reasonable inference. In such a case it seldom happens that under the testimony adduced it is proper for the court to say, as a matter of law, that the defendant has sustained the burden cast upon it. In nearly every instance the jury is the proper tribunal to draw inferences from the testimony. Linnen *v.* Commercial Casualty Co., 152 S. C. 450 (150 S. E. 127); Bounds *v.* W. O. W., 101 S. C. 325 (85 S. E. 770, Ann. Cas. 1917C, 589). The rule as laid down by the weight of authority may be stated as follows: Where the insured is innocent of aggression or wrongdoing and is killed in an encounter with another, his death is considered accidental, within the meaning of the usual accident policy. Interstate Business Men's Accident Asso. *v.* Lester, 257 Fed. 225 (168 C. C. A. 309). And even where the insured is the aggressor, if he could not reasonably anticipate bodily injury resulting in death to himself at the hands of another, the beneficiary may recover. Employer's Indemnity Co. *v.* Grant (C. C. A.), 271 Fed. 136 (20 A. L. R. 1118). See *Newsome* v. *Travelers Insurance Co.,* 143 *Ga.* 785 (85 S. E. 1035). But where, in an assault, the insured was the aggressor, and knew or should have anticipated that the other might kill him in the encounter, the death is not to be considered accidental. Taliaferro *v.* Travelers Protective Asso., 80 Fed. 368 (25 C. C. A. 494). If a man deliberately assaults another with a lethal weapon in his hand, such

as a knife, it can not be said that the injuries he receives in the resulting struggle are accidentally received. The very act of assaulting another with a knife is an invitation to that other to resist unto death; and if the aggressor is killed, it is a natural and logical sequence of his own voluntary act. Meister v. General Accident &c. Cor., 92 Or. 96 (179 Pac. 913, 4 A. L. R. 718, 722).

In Gilman v. N. Y. Life Insurance Co., 190 Ark. 379 (79 S. W. 2d, 78, 79, 97 A. L. R. 755, 756, 763), the court had for consideration and construction a policy of insurance which provided that "double indemnity shall not be payable if the insured's death resulted from . . committing an assault or felony." In construing this provision the court said: "We think the word 'assault' as here used means something more than a simple assault. 'The language is that the double indemnity shall not be paid to the insured 'from committing an assault or felony.' If the insured had been killed while committing larceny, burglary, robbery, arson, or any other felony, no liability would attach. The word 'assault' as here used refers to such an assault as would justify the person assaulted in taking his life. In other words, before appellee would be exempted from liability under its policy, Gilman [the insured] must have been guilty of such an assault as justified Walker [the person killing the insured] in firing the fatal shot. Whether Gilman made such an assault upon Walker was a question for the jury under proper instructions from the court." See also Gresham v. Equitable Accident Insurance Co., supra; 29 Am. Jur. 737, § 981; Accident Insurance Co. v. Bennett, 90 Tenn. 256 (16 S. W. 723, 25 Am. St. R. 685); Employer's Indemnity Cor. v. Grant, 271 Fed. 136 (20 A. L. R. 1118, 1122). The Supreme Court of South Carolina adopted the rule with reference to an identical provision in a policy, that even if the assured be the aggressor in an encounter in which he is injured or killed, still the insured does not forfeit his insurance if he could not reasonably anticipate that he would receive bodily injury or be killed; and that ordinarily makes a question for the jury. However, if only one reasonable inference can be drawn from the testimony, then it becomes a question of law to be passed on by the court. Hope v. N. Y. Life Insurance Co., 186 S. C. 85 (195 S. E. 110). See Provident Life & Accident Insurance Co. v. Peace, 175 Okla. 266 (52 Pac. 2d, 769 (3, 4), 772). To illustrate: If A in anger, but without provocation,

slapped B, or merely jerked him around, having nothing but his hand with which to injure B, and B then pulled from his pocket a pistol and killed A, A not knowing that B had a pistol or any other lethal weapon, and A having no cause to reasonably anticipate that he would be killed, or that they would otherwise engage in anything but a fist fight, a recovery by the beneficiary could be had under the double-indemnity (or accident) feature of this policy.

It appears from the testimony of Mattie Riggins, the insured's widow (a witness for the plaintiff), that she was living with the insured at the time she shot him. "Andy [the insured] and I had fought many times before, and my brothers got mixed up in it a couple of times too. He has beaten me many times, and cut my arm, and knocked me through a window once, and blackened my eyes several times." It further appears from her testimony that on the night she shot the insured, he went down to a carnival with two car-loads of men, and that later on she went to the carnival with her sister, Christine Talbot, Bob Crawford, and Florence White. "I saw him [the insured] at the carnival and he was with Grey Eyes' wife. I went up and said, 'What's this?' And he said, 'It isn't anything;' and she said it was just a friendly act. He told me to go home, and I told him I wouldn't go home. So he picked me up around the waist and carried me outside of the carnival. He hit me on the nose and made my nose bleed. He hit me on the head, and there were some white people near by, and he said 'Get moving. Don't stay around here.' My sister, Florence White, was there all the time; saw this happen. He hit me just one other place beside on the nose and on the head. He didn't kick me. He threatened me with his knife down there by the carnival, and said 'I'll kill you.' Bob Crawford brought me home with my sisters. . . When Andy came home he pounded on the door and wanted to get in. I didn't let him in. He broke in. . . I was sitting there in a chair. He reached in his pocket for his knife and said, 'I ought to do something to you.' [This was the first time the insured came home.] I ran through the door and down the stairs and got officer Conway, and he called officer Lawrence. They came back to the apartment, and Conway went up to Andy and said, 'Andy, have you got money you want to throw away for nothing?' and tried to shame him a little bit. The

officer said to me, 'If we let Andy go now, is it all right for Andy to stay away to-night and come back in the morning for his clothes?' I said, 'Yes.' Then they all left, the officers and Andy. Something like ten or fifteen minutes later Andy came back and knocked on the door. I wouldn't let him in. I told him I wouldn't let him in; to do what the officers told him to do. I don't remember whether he started to pound on the door and cursing and swearing or not. I don't remember whether he said, 'When I get in, I'm going to kill you' or not. . . I do not know why he came back the second time. He didn't have a chance to tell me why he came back. At the time I got the gun I didn't have any intention of killing Andy. I didn't feel any different toward Andy that night than I did on other occasions when we had quarreled. . . When I got the gun it was not my intention to shoot him. I shot him because I was afraid. I pulled the trigger of the gun intentionally. I guess I did. I was excited at the time I got the gun. It was Andy's gun. It had been kept in the drawer in my bedroom. . . When I first got the gun I knocked the safety off of it. I was at the door of the bedroom by the hall then. Andy was on the outside then. . . I knew I pulled the trigger of the gun. When I pulled the trigger I shot and he fell in the doorway. I shot him when he broke in the door. . . I don't remember whether he said he had the knife and was going to kill me when he got in [on the second occasion]. I had seen the knife the first time he broke in, when I was sitting in the chair in the room. . . He had had the knife on him, but I didn't know whether he had it then or not, but I know he did have it. . . I was not jealous of Grey Eyes' wife. I had never threatened Andy that I would shoot him if he made trouble. I never gave Andy any reason to believe that I would shoot him if he came in the house that night. . . I knew it was Andy that was coming in that door. After he was shot he fell right in the doorway."

Florence White, sister of the insured's wife and a witness for the defendant, testified to practically the same thing as did Mattie, and in addition to that when she saw the insured and Mattie at the carnival, "they were just tussling. I wouldn't say he had hold of her. They were tussling. They were swinging on each other with their fists. He was hitting her, trying to catch her, and naturally she was trying to dodge the licks and get in a lick herself.

He was swearing. . . Andy caused Mattie's nose to bleed, and her face was kind of swollen. . . He [the insured] was a powerful, broad-shouldered kind of a fellow; he was husky. He was all right at times as long as he wasn't drinking. He had a pretty mean temper then. He and Mattie had done fighting lots of times before. . ." She further testified, that they went home (her room being across the hall from Mattie's and the insured's apartment), that the first time the insured came home the cops told him to go away, and he did; that he had threatened Mattie several times before, but nothing would happen, and he had never broken the door down before; that "on that particular night he threatened her the last time he came to the door. He asked her if she was going to open the door, and she didn't answer, and, 'Well,' he says, 'I am coming in there, and' he said, 'You and I, one of us, are going to heaven or hell.' We could hear, or hear very plainly, what he was saying. . . He started shoving against the door. Pretty soon he broke it in. . . As to whether I heard a shot, I don't know what it was, all shot, door breaking in, all happened at the same time. . . Mattie fired just as the door broke open. . . At no time had I ever heard Mattie threaten to shoot Andy."

When a verdict for the defendant is directed, and exception thereto is brought to this court by the plaintiff, the direction will be affirmed where it appears from all the evidence, both for the plaintiff and the defendant, with all reasonable deductions therefrom, that the verdict was demanded. *Johnson* v. *Ætna Life Insurance Co., 24 Ga. App.* 431 (101 S. E. 134) ; *Pruitt* v. *Progressive Life Insurance Co., 55 Ga. App.* 483 (190 S. E. 435) ; Code, § 110-104. However, it is for the jury to determine whether or not death by being shot by another is an accident, where the evidence is conflicting as to whether or not the insured's own wrongful conduct produced his death, or he voluntarily and intentionally committed acts from which he foresaw, or should have foreseen, that death or injury might result. Under one phase of the evidence in the instant case, the jury would have been authorized to say that the fights between the insured and his wife were so common that when he attempted to and did force open and break down the door of his apartment, and attempted to enter his home, there was no reason for him to believe his wife would shoot him. It might be said, as a matter of common knowledge, that some men in an intoxi-

cated condition have entered their homes (when they knew their wives were therein) at unseemly hours and in an unseemly manner, and that one would not necessarily expect to be killed on such an occasion, especially where the wife knew it was he. In other words, the insured did not necessarily appreciate that by doing the act of forcing the door and breaking into his own home he was putting his life in hazard. In this connection it might be noted this his wife, who killed him, testified: "I had never threatened Andy that I would shoot him if he made trouble. I never gave Andy any reason to believe that I would shoot him if he came in the house that night. . . I knew it was Andy that was coming in that door." It should also be noted that the evidence was not definite that he was approaching his wife with a knife, opened and drawn, in a manner which would put her in the attitude or fear for her own life and justify her in taking his life. Under another phase of the case, and all the circumstances—the occasion at the carnival, the occasion of his first return home, and the reasonable inference that he had been drinking, his physical size, and his remark, immediately before entering the apartment, that "one of us are going to heaven or hell,"—it might be said that the wife did fear for her life and was justified in shooting him, and further, that he could reasonably have anticipated that he would receive bodily injury or be killed, and, as he was killed, his death would not be considered accidental, but the result of his own "assault or felony" on another. Thus, under the evidence, there were questions of fact for the jury, and the judge erred in directing the verdict for the defendant.

*Judgment reversed. Gardner, J., concurs. Broyles, C. J., dissents.*