29196. METROPOLITAN LIFE INSURANCE
COMPANY *v.* ANGLIN.

DECIDED FEBRUARY 27, 1942.

*Smith, Smith & Bloodworth,* for plaintiff in error.

*William F. Buchanan,* as amicus curiæ.

*George & John L. Westmoreland,* contra.

BROYLES, C. J. Mrs. Lillie Anglin was the beneficiary in a policy of insurance issued by the Metropolitan Life Insurance Company on the life of her son, John A. Anglin. The insured died in October, 1939, and the insurance company, "without prejudice" to either party, paid Mrs. Anglin $712.95, the face value of the policy. The present action was brought against the insurance company by Mrs. Anglin to recover an additional sum of $712.95 under the double-indemnity provision of the policy. Both parties introduced evidence and the jury returned a verdict in favor of the plaintiff for $712.95, with interest thereon. The controlling question in the case is whether the court erred in overruling the defendant's motion for new trial based solely on the general grounds; and the determination of that question ultimately depends upon whether the insured "was killed by accidental means as provided in said policy," as alleged in the petition.

The policy provided for the payment of double indemnity "upon receipt of due proof that the insured, after attaining age 15, and

prior to attaining age 70, has sustained, after the date of issue of this policy, bodily injuries, solely through external, violent and accidental means, resulting, directly and independently of all other causes, in the death of the insured within ninety days from the date of such bodily injuries and while this policy is in full force and effect and while there is no default in the payment of premium beyond the grace period."

F. M. Threlkeld, a candy salesman, testified substantially as follows: At about six o'clock on the afternoon of October 4, 1939, as Threlkeld was leaving Miller's store at Brookhaven, Georgia, a young man whom he did not know asked him for a ride to Buckhead, Georgia. Threlkeld replied that it would take him about ten minutes to see two other customers and that if he was not in a hurry he (Threlkeld) would give him a lift. The young man, who turned out to be John A. Anglin, the insured, got on the rear seat of the automobile, and Threlkeld drove a quarter of a mile and parked his car in front of the store of Mr. and Mrs. Cox. Threlkeld then entered the store and walked over to the candy counter. Miss Edna Knight, who was the only person in the store at the time, reminded Threlkeld that the store owed him eighty-five cents on his previous sale and handed him a one-dollar bill, he giving her fifteen cents in change. While Threlkheld was at the candy counter, Anglin got out of Threlkeld's car and came in the store and began talking to Miss Knight. Anglin then insisted that Threlkeld go. Threlkeld went out to his automobile, followed by Anglin, and looked in the pocket of the car for his revolver. Anglin said: "What are you looking for?" Thinking that Anglin might be playing a prank on him, Threlkeld said: "You know what I am looking for. Give me my gun." Anglin then drew the pistol on Threlkeld and said: "I have got your gun, get in and travel." This frightened Threlkeld and he got in the car and drove it a short distance to the store of Mr. W. R. Smith. A few minutes after Threlkeld had entered the store he heard a shot outside that sounded as if it came from his revolver, and Anglin rushed in the store and said: "Where is the candy man? Did you hear that shot?" He then said "something about there being five more in there just like it," and that he was "going to kill the candy man." Threlkeld was frightened and tried to make friends with Anglin by inviting him to have a coca-cola with him,

which he did. Anglin then said something about shooting bananas off of a bunch. Anglin then insisted that Threlkeld leave the store, and Threlkeld asked him to wait a minute until he could finish getting his order. Anglin replied: "Well, make haste and get it. It's the last d—— order you will ever get." Mack Smith asked Anglin if he was going to shoot the candy man, and Anglin said, "Yes," or "Hell, yes," and began to flourish the pistol. Threlkeld then went out and started to get in the driver's seat of his car. Anglin said: "You don't mind my driving, do you?" Threlkeld said, "No," and got on the rear seat of the car. Threlkeld then started to turn off the "dome light," and Anglin said: "Leave that light on and keep your hands in front of you, and don't you reach for nothing." Anglin then turned the car around and went back up Candler Road to Peachtree Road and drove rapidly up that road and turned to the left into Osburn Road just beyond Hospital 48. He then ordered Threlkeld to turn out the light and to keep his hands in front of him and not to reach for anything. Threlkeld realized that it might be a hold-up and put all his money in his shoe except the one-dollar bill he had gotten from Miss Knight. After crossing House Road the roadbed got very "rough and rutty," and Anglin drove rapidly over this road for about half a mile and turned into a lane. The engine stopped and Anglin got out of the car, ordered Threlkeld at the point of the pistol to the front of the car, and robbed him of the one-dollar bill he had gotten from Miss Knight. With the pistol still pointed at Threlkeld, Anglin ordered him to get back in the car. Anglin then backed out of the lane and drove rapidly and recklessly back the way he had come. He had driven only a short distance when he lost control of the car and ran it into a slight embankment. Threlkeld's car was a two-door, five-passenger car, and he had removed the right side of the front seat to get more room for his merchandise. When the car struck the embankment something heavy fell on the floor and, thinking it might be his pistol, Threlkeld tried to grab it. At the same time Anglin leaned over to his right and reached for it. The object proved to be Threlkeld's pistol and both he and Anglin got hold of it at the same time. Threlkeld succeeded in jerking it away from Anglin, and, being terribly frightened, and not knowing whether Anglin had another weapon, shot Anglin three times. Threlkeld then propped Anglin

up against the back seat of the car and drove back to where he had first picked him up at Mr. Miller's store and reported that he had been "robbed and carried for a ride," and asked that some one identify Anglin.

Miss Edna Knight testified that after Anglin came into the Cox store, he showed her a "gun" and said "something bad is going to happen," and cautioned her several times not to tell any one that she had seen him. The material part of Threlkeld's testimony as to what occurred at the Smith store was substantially supported by the testimony of other witnesses, and there was nothing to contradict or discredit his testimony as to what transpired while only Threlkeld and Anglin were present. It is true, however, that Threlkeld testified positively that he did not know the deceased and the deceased's brother swore that he did. However, on cross-examination this brother, J. J. Anglin, testified: "I don't know whether he knew him. All in the world I know is that I saw them together three or four times and the last time was one month before this occasion. He [the deceased] went over there [to Threlkeld's automobile] and I didn't hear them talking and I don't know whether he told him who he was or not. I don't know what they said. That's all I base it on." Moreover, this discrepancy, if any, in the evidence was not upon a material matter. There was abundant testimony to the effect that the deceased was a much larger, younger and more powerful man than Threlkeld. Paragraph 21 of the deceased's death certificate dealing with the "immediate cause of death" reads: "From pistol shot wounds from the hands of Mr. T. M. [F. M.?] Threlkeld, same being justifiable homicide. Coroner's verdict."

Without contradiction the evidence shows that the insured's death was caused by bodily injuries resulting directly and solely from external and violent means; and the question for determination is whether death resulted from "accidental means" within the meaning of the double-indemnity provision of the insurance policy. "Where one person injures another, and the injury is not the result of misconduct or provocation by the injured person, but is unforeseen by him, it is as to him an accident within the meaning of an accident policy insuring him against bodily injuries effected through external, violent, and accidental means." *Newsome* v. *Travelers Insurance Co.*, 143 *Ga.* 785 (85 S. E. 1035); *Travelers*

*Insurance Co.* v. *Wyness,* 107 *Ga.* 584 (3) (34 S. E. 113) ; *Pan-American Life Insurance Co.* v. *Bagley,* 55 *Ga. App.* 610, 617, 618 (191 S. E. 144) ; *Travelers Insurance Co.* v. *Newsome,* 147 *Ga.* 608 (95 S. E. 4). "Where an insured's death is the result of a mutual combat or fight between him and another person, or is the result of his misconduct, or his participation in the act which caused his death, it is not 'accidental' in the sense of the double-indemnity clause in an insurance policy." *New York Life Insurance Co.* v. *Ittner,* 62 *Ga. App.* 31, 38 (8 S. E. 2d, 582), and cit. "If a person holding a policy insuring him against accidental injury does something which culpably provokes or induces the act causing his injury or death, then the result is not accidental; but, if he is wholly free from culpability himself, the result is accidental as to him, though it may have been within the deliberate intent of the aggressor." Interstate Business Men's Accident Asso. *v.* Lester, 257 Fed. 225 (4) (168 C. C. A. 309). Under the foregoing rulings not only did the plaintiff, Mrs. Lillie Anglin, fail to make out a prima facie case for the recovery of double indemnity on the theory of "accident," but the undisputed evidence demanded a finding that the insured's death resulted directly and proximately from his own flagrant and criminal misconduct.

Counsel for the defendant in error rely on the case of *Riggins* v. *Equitable Life Assurance Society,* 64 *Ga. App.* 834 (14 S. E. 2d, 182), to support their contention that the evidence was conflicting in the instant case and sufficient to support the verdict. While it is true that this court held in the *Riggins* case that "there were questions of fact for the jury, and the judge erred in directing the verdict for the defendant," both the pleadings and the facts of the two cases are quite different. For instance, while in the *Riggins* case the plaintiff based her right to recover upon a double-indemnity provision substantially the same as the one in the instant case, the insurer pleaded that it was not liable because the policy provided that it did not cover accidental injury or death "caused directly or indirectly . . by participating in or in consequence of having participated in the commission of an assault or felony." In this situation, of course, the burden was upon the plaintiff to prove her case as laid; and, if she did, the burden then shifted to the defendant insurer to prove that it came within the exception pleaded by it. A casual reading of the evi-

dence in the *Riggins* case shows clearly the wide difference between the facts of that case and those of the case we are considering. For instance, one striking difference between the two cases is well illustrated by the following statement made by this court in the *Riggins* case: "However, it is for the jury to determine whether or not death by being shot by another is an accident, where the evidence is conflicting as to whether or not the insured's own wrongful conduct produced his death, or he voluntarily and intentionally committed acts from which he foresaw, or should have foreseen, that death or injury might result. Under one phase of the evidence in the instant case, the jury would have been authorized to say that the fights between the insured and his wife were so common that when he attempted to and did force open and break down the door of his apartment, and attempted to enter his home, there was no reason for him to believe his wife would shoot him. It might be said, as a matter of common knowledge, that some men in an intoxicated condition have entered their homes (when they knew their wives were therein) at unseemly hours and in an unseemly manner, and that one would not necessarily expect to be killed on such an occasion, especially where the wife knew it was he. In other words, the insured did not necessarily appreciate that by doing the act of forcing the door and breaking into his own home he was putting his life in hazard. In this connection, it might be noted that his wife, who killed him, testified: 'I had never threatened Andy that I would shoot him if he made trouble. I never gave Andy any reason to believe that I would shoot him if he came in the house that night. . . I knew it was Andy that was coming in that door.'"

In view of the foregoing ruling, which is controlling in the case, it is unnecessary to consider the other assignments of error. The denial of a new trial was error.

*Judgment reversed. MacIntyre and Gardner, JJ., concur.*