29394. NELSON *v.* AMERICAN NATIONAL INSURANCE COMPANY.

DECIDED JUNE 29, 1942. REHEARING DENIED JULY 22, 1942.

*P. T. Hipp, Duke Davis,* for plaintiff.
*Lovejoy & Mayer,* for defendant.

STEPHENS, P. J. Mrs. Bettie L. Nelson brought suit against American National Insurance Company to recover on a policy issued on the life of Charlie J. McCain in which she was named beneficiary. The policy provided for the payment of $2000 on proof of death of the insured, and for an additional $2000 under the following provision: "Upon receipt at its home office of this policy, duly discharged, and satisfactory written proof that the death of the insured resulted directly and independently of all other causes from accidental drowning or from bodily injury, such drowning or injury having occurred after the date of this policy, and such injury having been effected solely through external, violent, and accidental means evidenced by internal injury revealed by an autopsy or evidenced by visible contusion or wound on the exterior of the body, and that such death occurred within one hundred days after sustaining such injury, the company will pay a double-indemnity death benefit, as set forth above. The double

accidental-death benefit will not be payable if the injury was received: (a) When or after the insured is sixty-five years of age; . . (f) Excepting policies written in the States of Iowa and North Carolina, from any violation of law by the insured. . ."

On proof of death being filed, the company paid the face amount of the policy but refused to pay the amount claimed under the double-indemnity provision sued for in the present action. The defendant denied liability on the grounds that the death of the insured was not by accidental means, and because his death was a result of a violation of law, in that, while under the influence of intoxicating liquor, he went to the store of one George Jackson with a loaded pistol in his hand and made an assault on him, whereupon the said Jackson shot and killed the insured in defense of his own life. At the conclusion of the evidence the court directed a verdict in the defendant's favor. The plaintiff filed a motion for new trial on the usual general grounds and on the ground that the court erred in directing the verdict for the defendant.

The uncontradicted evidence showed substantially the following: The insured, sometimes called Jack McCain, worked for his brother, Olan McCain, who operated a garage and used-car lot at Lee's Crossing, just outside the city limits of LaGrange, Georgia, and adjacent to a store operated by George Jackson. Olan McCain sometimes took care of Jackson's store business in the absence of Jackson, and sometimes assisted him in the store. Late in the afternoon of February 1, 1941, just before dark, the insured had been in Jackson's store. He was under the influence of liquor and had some conversation with Jackson, but the evidence does not indicate the nature of the conversation or show that there was then or had ever been any hard feelings between the two. However, it appears that one Charlie Will Darden, at the suggestion of another person, saw fit to escort McCain from the store. McCain went without any protest and proceeded to the near-by garage of his brother, Darden returning at once to the store. Shortly thereafter the insured appeared at the door of Jackson's store, displaying in his hand by his side a pistol which was later found to have been loaded. Jackson, who had been standing behind a candy counter, approached the insured, who was facing him, and said "Jack, don't come back in here. I am a friend of yours and a friend of the

whole family, and I don't want to have any trouble with you." The insured said: "I have got mine; you get yours," at the same time taking a step backwards while still holding the pistol by his side. Jackson, who had not been known by any one present to be armed, instantly shot and killed the insured. One witness testified that when McCain said, "I have got mine and you get yours," he didn't know whom he was talking to.

It does not appear from uncontradicted evidence as a matter of law that the death of the insured was not accidental within the meaning of the policy, or that the injury which caused his death was received from a violation of law by the insured. While conceding that if the insured was the aggressor or wrongdoer and by such act caused or contributed to the act which injured him the injury was not an accident within the meaning of the policy, the evidence does not conclusively and without contradiction establish as a fact that the insured was such an aggressor or wrongdoer. In the first place there is testimony, although perhaps contradicted by other testimony, that McCain had no animosity towards Jackson, and was manifesting none towards him, and committed no aggression towards him other than, perhaps, McCain's statement, "I have got mine; you get yours," whatever this may have meant. It also appears from this testimony that McCain, instead of manifesting any animosity towards Jackson, was looking for his own brother with the intention of killing him. The witness who gave this testimony stated that McCain expressed the intention in the store that he, McCain, was going to kill his brother. It is inferable that Jackson was present and that he heard this. This witness testified that McCain had nothing against Jackson and did not call Jackson's name, and that the witness did not know whether Jackson knew that McCain was talking to Jackson or not when McCain stated that he had his gun and, "You get yours." The witness testified that McCain called his brother Olan's name in the vocative when he said for some one to get his gun. This testimony is as follows: "He [McCain] told him to get his. He told Olan to, but Olan wasn't in there. I knew he was talking to Olan. He called his name." The witness also testified: "He [Jackson] thought he was going to kill Olan, his brother. I know it, because I was right there. How do I know that Mr. Jackson thought he was going to kill Olan? Well, he said he was. Jack [McCain]

said he was. Jack said he was going to kill Olan. Going to kill Olan if he could find him. He was after his brother. He was going to kill Olan if he could find him, and he didn't find him, and then he says, 'I have got my gun and you get yours,' and I don't know whether Mr. Jackson knew he was talking to him or not; he didn't call Mr. Jackson's name, because he didn't have a thing against Mr. Jackson."

It appears that McCain was carrying a pistol pointing downward, and it nowhere appears that McCain pointed it at Jackson, or any one else, or made any attempt to use the pistol on Jackson, or on any one else. McCain's statement did not carry with it a present intent to assault or injure any one. This statement did not contain any threat or show any intention by McCain to use his pistol on Jackson or on any one else, before the latter could get his own pistol. Whatever may be Jackson's guilt or innocence, it is inferable from the evidence that McCain had made no assault on Jackson or any attempt to injure him in any way, and that Jackson shot McCain without being justified by any assault on him or by any threat by McCain. While from Jackson's viewpoint he may have felt justified in shooting McCain as the result of his coming into Jackson's store with a pistol pointed downward accompanied with the statement that "I have got mine; you get yours," it does not appear conclusively as a matter of law that McCain himself could have reasonably anticipated that his conduct would cause or provoke Jackson at the time to shoot him. In order to establish that the shooting of McCain was not an accident it is necessary that McCain, by some misconduct on his part, brought about his own injury, or in some manner participated in the act which caused his injury. In *Gaynor* v. *Travelers Insurance Co.*, 12 *Ga. App.* 601 (4) (77 S. E. 1072), it was held: "Where one person injures another and the injury is not the result of misconduct or participation of the injured party, but is unforeseen by him, it is, as to him, accidental, although it may be intentionally inflicted by the other party." This case involved an accident policy insuring against loss resulting from bodily injuries effected directly and independently of all other causes through "external, violent, and accidental means." In *New York Life Ins. Co.* v. *Jennings,* 61 *Ga. App.* 557, 563 (6 S. E. 2d, 431), in an opinion written by Judge MacIntyre, the following excerpt from the charge to the

jury was approved: "Even where the insured is the aggressor, if the insured could not reasonably anticipate bodily injury resulting in death to insured at the hands of another, the beneficiary may recover." It is therefore inferable that McCain's death at the hands of Jackson was not caused or justified by any act of McCain, and that McCain did not at the time have in mind, or could not have reasonably expected, that Jackson, under the circumstances, would shoot him. It therefore does not appear as a matter of law that the death was not the result of an accident within the sense of the policy.

It does not appear conclusively and as a matter of law that McCain at any time acted in violation of law, and that his death was caused by an injury received "from any violation of law" by him. The witness who was with McCain at the time testified that McCain was "drinking a little but he wasn't drunk." To whatever extent it may be shown that McCain was under the influence of liquor at the time, it does not appear conclusively that he was in such a state of intoxication and under such conditions that his conduct amounted to a violation of law. It would have been a jury question whether McCain's conduct was boisterous, or that his language was such, even assuming that he was intoxicated, which does not appear conclusively, as would constitute a violation of the penal statute prohibiting any person appearing in a public place in an intoxicated condition where his drunkenness was manifested by boisterousness or by indecent condition or acting, or by unbecoming language or loud and violent discussions. It certainly does not appear that in carrying the pistol pointed downward, as the uncontradicted testimony shows, he was acting in violation of any law, or that he had the pistol concealed in violation of law, or that he pointed it at another in violation of law, or that he attempted to point it at another. It therefore does not appear that McCain committed any assault or pointed the pistol at Jackson or at any one else.

Even if McCain was preparing to make an assault on Jackson, or point a pistol at him, and this does not appear conclusively from the uncontradicted testimony, this constituted no violation of law. "Mere preparation to commit a violent injury upon the person of another, unaccompanied by a physical effort to do so, will not justify a conviction for an assault." *Brown* v. *State, 95 Ga.*

481 (20 S. E. 495). While it may be contrary to law for a person to have in his possession a pistol without having procured a license, it does not appear that McCain, in having the pistol, violated the law against carrying a pistol without having procured a license. The mere fact that on a criminal trial the State makes out a prima facie case and carries the burden of proof on mere proof' that the defendant had or carried a pistol outside of his own home or place of business, without proving the negative that the defendant had not procured the license required by law as a condition precedent to the right to carry the pistol, does not render the mere carrying of a pistol by a person outside of his home or place of business conclusive proof, as a matter of law, that he carried the pistol without having obtained a license. A mere rule of procedure with reference to the establishment of a prima facie case, or as to the carrying of the burden of proof, can have no bearing on what facts, as a matter of law, establish a certain legal conclusion.

Even if McCain, in any of his conduct which led up to his being shot, was acting in violation of law, it must appear that such violation had some causal connection with the act of Jackson in shooting him. Before the beneficiary can be barred of a recovery under the provision of this policy that the benefit sued for is not payable if the injury was received from any violation of law by the insured, it must appear that the conduct of McCain which it is claimed brought about his death, even if such conduct was a violation of law, was such that it could be reasonably anticipated that it would cause the injury which resulted in his death, and that the injury was a natural and reasonably to be anticipated consequence of his conduct. *Empire Life Insurance Co.* v. *Einstein,* 12 *Ga. App.* 380, 387 (77 S. E. 209). In that case it is stated as follows: "The real question is whether Einstein's [the insured's] violation of the law was the proximate cause of his death. All other issues (such as, what offense, if any, Campbell, who killed him, might be guilty of, or whether in fact he was justifiable) are subordinate to this. If it is immaterial that Einstein provoked the difficulty by using opprobrious words and striking Campbell (because this can not be held to be the causa causans of Einstein's death), then the judge's ruling as to Campbell's testimony is unimportant; for even if Campbell had testified to such a state of

facts as must have convinced a jury that he was justifiable in killing Einstein, still the insurer would not be relieved if, as a matter of fact, Einstein did not have in mind, and could not reasonably have expected, death as a result, and if no other reasonable man would have anticipated that death would probably result from his original unlawful act." The undisputed and uncontradicted evidence does not establish as a matter of law that the death of McCain resulted from any injury, such as the shooting of him by Jackson, which was received from any violation of law by McCain. In other words, it does not appear conclusively and as a matter of law that McCain's act, even if he acted in violation of law, and even considering his remark as to his having a gun and for the other person to get his, had in any way a causal connection with Jackson's act in shooting him.

The evidence was sufficient to authorize a finding that the death of McCain was accidental within the terms of the policy, and was not the result of any injury received from any violation of law. The evidence was sufficient to authorize a finding for the plaintiff, and the court erred in directing a verdict for the defendant. It was error to overrule the motion for new trial.

*Judgment reversed. Felton, J., concurs.*

SUTTON, J., dissenting. I think that the evidence establishes conclusively that the death of the insured was not by accidental means, and that as a verdict in favor of the defendant was demanded as a matter of law the court did not err in directing such verdict and in overruling the plaintiff's motion for new trial. The conduct of the insured amounted to an assault upon Jackson. While an assault is defined in the Code, § 26-1401, as "an attempt to commit a violent injury on the person of another," it has been held by the Supreme Court and this court that "to constitute an assault no actual injury need be shown, it being only necessary to show an intention to commit an injury, coupled with an apparent ability to do so." *Dorsey v. State,* 108 *Ga.* 477, 479 (34 S. E. 135); *Thomas v. State,* 99 *Ga.* 38 (26 S. E. 748); *Harrison v. State,* 60 *Ga. App.* 610 (4 S. E. 2d, 602). Armed with an exposed pistol and under the influence of liquor, to Jackson's entreaty that he go away and avoid trouble, the insured answered: "I have got mine; you get yours." It could not reasonably be contended that by that remark he was doing otherwise than challeng-

ing Jackson to a mortal combat and was apparently in a position to inflict a deadly injury. He was bound to know or anticipate that Jackson, in the fears of a reasonable man, would do what he could to avoid injury or death, and might properly conclude that the only way to save himself from death was to "beat him to the draw," and not hazard an escape from the first shot of the insured.

In *Riggins* v. *Equitable Life Assurance Society,* 64 *Ga. App.* 834, 836 (14 S. E. 2d, 182), it was said: "The rule as laid down by the weight of authority may be stated as follows: Where the insured is innocent of aggression or wrongdoing and is killed in an encounter with another, his death is considered accidental, within the meaning of the usual insurance policy. Interstate Business Men's Accident Asso. *v.* Lester, 257 Fed. 225 (168 C. C. A. 309). And even where the insured is the aggressor, if he could not reasonably anticipate bodily injury resulting in death to himself at the hands of another, the beneficiary may recover. Employer's Indemnity Co. *v.* Grant (C. C. A.), 271 Fed. 136 (20 A. L R. 1118). See *Newsome* v. *Travelers Insurance Co.,* 143 *Ga.* 785 (85 S. E. 1035). But where, in an assault, the insured was the aggressor, and knew or should have anticipated that the other might kill him in the encounter, the death is not to be considered accidental. Taliaferro *v.* Travelers Protective Asso., 80 Fed. 368 (25 C. C. A. 494). If a man deliberately assaults another with a lethal weapon in his hand, such as a knife, it can not be said that the injuries he receives in the resulting struggle are accidentally received. The very act of assaulting another with a knife is an invitation to that other to resist unto death; and if the aggressor is killed, it is a natural and logical sequence of his own voluntary act. Meister *v.* General Accident &c. Cor., 92 Or. 96 (179 Pac. 913, 4 A. L. R. 718, 722)." In the Meister case cited above, the court uses language which is quoted from another case and which is equally applicable to the facts of the present case: "From the inception of the difficulty the deceased appears to have been the aggressor. He was the first to draw a deadly weapon, accompanying that action with the exclamation that he 'must have revenge; . . put yourself in shape.' This can be regarded in no other light than an invitation to a deadly encounter, in which the deceased voluntarily put his life at stake, and deliberately took the chances of getting killed. Where a person thus invites another to a deadly encounter, and

does so voluntarily, his death, if he sustains a mortal wound, can not be regarded as 'accidental' by any definition of that term which has heretofore been adopted."

The only reasonable inference to be drawn from the facts of the present case, in my opinion, is that the insured was bound to anticipate that because of his conduct he would be killed by Jackson in the fears of a reasonable man, and under the law his death can not be said to have been caused by "accidental means."

The evidence shows that the insured had been in Jackson's store a few minutes before the occasion on which he appeared at the door and the conversation leading up to the fatal shooting ensued. All the testimony indicates that though not drunk he was under the influence of intoxicating liquor and in a belligerent mood. He was resentful of his ejection from the store, and apparently he regarded his brother Olan as having effected his removal. It is stated in the majority opinion that a witness testified that "McCain called his brother Olan's name in the vocative when he said for some one to get his gun." If thereby is meant that the witness was testifying to a remark made by the deceased when *Jackson was facing* him just before the fatal shot I can not agree to that interpretation of the evidence. This witness, presumably E. O. Bolt, testified: "He told Olan to [get his gun], but Olan wasn't there. I know he was talking to Olan. He called his name. He called his name first, *but Mr. Jackson was back in the store."* (Italics mine.) The evidence shows without contradiction that Jackson was in the rear of the store, back of a candy counter, when the insured appeared at the door. So manifestly it follows that if the insured "called his brother Olan's name in the vocative," it was not on the occasion when Jackson, after leaving the candy counter, and proceeding to the door and remonstrating with the insured, shot the insured upon the latter making the remark "I have got mine; you get yours." The evidence shows that at that time Jackson was facing the insured at the door. The insured was evidently not so drunk as not to be aware of the identity of an old acquaintance, Jackson, and I think it would be a strained construction of the evidence to say that the remark of the insured, "I have got mine; you get yours," was then intended for the ears of his brother. Jackson knew of the bad mood of the insured. The insured knew that Jackson knew this. He had only a short time

before been ejected from the small store by some one other than Jackson. So, notwithstanding that up until the night of the tragedy these two men had apparently been on good terms, there was nothing to prevent the insured from thinking that Jackson would regard him, an armed and belligerent man, as anything less than dangerous or that, under the fears of a reasonable man, Jackson would do what he regarded as necessary for his own protection. When, therefore, *with Jackson facing him,* the insured made the statement, "I have got mine; you get yours," I think that it would be unreasonable to say that he did not know or should not have anticipated that thereby his life was placed in peril at the hands of Jackson. What Jackson did was not something that was "unforeseen, unexpected, or unusual." Therefore the insured's death was not brought about by accidental means. I think the judgment of the trial court should be affirmed.