36630. JOHNSON, Administrator *v.* SOUTHERN LIFE INSURANCE COMPANY.

DECIDED APRIL 8, 1957—REHEARING DENIED APRIL 25, 1957.

*T. Kelly McCutchen,* for plaintiff in error.

*Pittman, Kinney & Pope,* contra.

CARLISLE, J. The present suit is brought under the "Nonoccupational accident death" agreement of the policy of insurance which provides: "Subject to all the provisions of this policy, if the employee while insured hereunder, sustains one of the losses listed in the following table of benefits as the direct result of non-occupational accidental bodily injury independently of all other causes, as evidenced by a visible contusion or wound on the exterior of the body. . . and the date of occurrence of such injury is not more than 90 days prior to the date such loss was sustained, the company, on receipt at its home office of due and satisfactory proof of such loss, will pay to the employee if living on the date of the payment by the company for such loss, otherwise to the beneficiary of the employee, the amount shown for such loss in the table of benefits based on the full amount of insurance stated in the schedule of insurance." (The table of benefits provides for the payment of the full amount of insurance in the event of loss of life.) This provision of the policy contains among others the following limitation: "No benefits shall be payable for any loss which results directly or indirectly, wholly or partly, from: . . . committing an assault or felony."

"When a verdict for the defendant is directed, and exception thereto is brought to this court by the plaintiff, the direction will be affirmed where it appears from all the evidence, both for the plaintiff and the defendant, with all reasonable deductions therefrom, that the verdict was demanded. *Johnson* v. *Aetna Life Ins. Co.,* 24 *Ga. App.* 431 (101 S. E. 134) ; *Pruitt* v. *Progressive Life Ins. Co.,* 55 *Ga. App.* 483 (190 S. E. 435) ; Code § 110-104. However, it is for the jury to determine whether or not death by being shot by another is an accident, where the evidence [together with all reasonable inferences to be drawn therefrom] is conflict-

ing as to whether or not the insured's own wrongful conduct produced his death, or he voluntarily and intentionally committed acts from which he foresaw, or should have foreseen, that death or injury might result." *Riggins* v. *Equitable Life Assurance Soc.*, 64 *Ga. App.* 834, 840 (14 S. E. 2d 182).

The plaintiff assigns error on the trial court's direction of the verdict for the defendant on the ground that there were issues of fact for determination by the jury. To determine whether or not the trial court erred in its direction of the verdict for the defendant, it becomes necessary for us to answer two ancillary questions: (1) Did the plaintiff carry the burden required of him in showing that the insured's death was accidental? (2) Did the death of the insured come within the exclusion provision of the policy that no benefits would be paid for any loss which resulted directly or indirectly, wholly or partly, from the commission of an assault or felony by the insured?

In the *Riggins* case, supra, this court went thoroughly into the questions presented here in its consideration of a suit upon the accidental feature of a policy of insurance, containing an exclusion provision very similar to that contained in the present policy. In that case, this court stated (p. 835), "There can be no accident, as a matter of law, without existence of a fact or facts pointing to death through accidental means. It is incumbent upon the plaintiff to show that in the act or acts which preceded the injury alleged to have caused the insured's death, something unforeseen, unexpected, or unusual happened. The test seems to be: Did the insured appreciate that by doing the act he was putting his life and limb in hazard? *Tabor* v. *Commercial Casualty Insurance Co.*, 104 W. Va. 162 (139 S. E. 656, 57 A.L.R. 971). Thus, even though his death might be considered accidental, under the general accident clause in the policy, nevertheless if his death was caused by an 'assault or felony' as stated in the policy, he could not recover. Generally speaking, under a life-insurance policy, a prima facie case in favor of the plaintiff's right of recovery is ordinarily established by proving and introducing the policy and proving the fact of death and notice thereof to the company. 37 C. J. 635. However, under a life-insurance policy with an accident feature, in order to make out a prima

facie case solely under the accident feature, there must be proof of the policy, proof of death, and further proof that the death occurred from accident or accidental means as defined in the policy. *New York Life Insurance Co.* v. *Jennings,* 61 *Ga. App.* 557, 559 (6 S. E. 2d 431); *Gaynor* v. *Travelers Insurance Co.,* 12 *Ga. App.* 601 (77 S. E. 1072); *Georgia Life Insurance Co.* v. *McCranie,* 12 *Ga. App.* 855, 863 (78 S. E. 1115)."

In the instant case, the burden was on the plaintiff to prove that the death resulted "as the direct result of nonoccupational accidental bodily injury independently of all other causes, as evidenced by a visible contusion or wound on the exterior of the body," as this is in the definition of nonoccupational accidental death contained in the policy.

As the defendant sought to invoke the limitation contained in the policy that no benefits would be paid for any loss which resulted directly or indirectly, wholly or partly, from the insured's committing an assault or felony, the burden of proof was then shifted to the defendant to show, as it had pleaded, that the death of the insured was brought about under circumstances which came within this limitation. *New York Life Ins. Co.* v. *Jennings,* 61 *Ga. App.* 557, 560, supra; *Travelers Ins. Co.* v. *Wyness,* 107 *Ga.* 584 (2) (34 S. E. 113).

At another point in the *Riggins* case, supra (p. 836), it is stated, "in a case like this, before a verdict for the defendant can properly be directed, the evidence must not only support the inference that the person charged with the killing killed the insured, as contended by the defendant, but must also exclude any other reasonable inference. In such a case, it seldom happens that under the testimony adduced it is proper for the court to say, as a matter of law, that the defendant has sustained the burden cast upon it. In nearly every instance the jury is the proper tribunal to draw inferences from the testimony. . . The rule as laid down by the weight of authority may be stated as follows: Where the insured is innocent of aggression or wrong-doing and is killed in an encounter with another, his death is considered accidental within the meaning of the usual accident policy. Interstate Business Men's Accident Asso. *v.* Lester, 257 Fed. 225 (168 C.C.A. 309). And even where the insured is the aggressor,

if he could not reasonably anticipate bodily injury resulting in death to himself at the hands of another, the beneficiary may recover. Employer's Indemnity Co. *v.* Grant (C.C.A.) 271 Fed. 136 (20 A.L.R. 1118). See *Newsome* v. *Travelers Insurance Co.*, 143 *Ga.* 785 (85 S. E. 1035). But, where in an assault the insured was the aggressor, and knew or should have anticipated that the other might kill him in the encounter, the death is not to be considered accidental. Taliaferro *v.* Travelers Protective Asso., 80 Fed. 368 (25 C.C.A. 494). If a man deliberately assaults another with a lethal weapon in his hand, such as a knife, it cannot be said that the injuries he receives in the resulting struggle are accidentally received. The very act of assaulting another with a knife is an invitation to that other to resist unto death; and if the aggressor is killed, it is a natural and logical sequence of his own voluntary act. Meister *v.* General Accident &c. Cor., 92 O. R. 96 (179 Pac. 913, 4 A.L.R. 718, 722).

"In Gilman *v.* N. Y. Life Insurance Co., 190 Ark. 379 (79 S. W. 2d, 78, 79, 97 A.L.R. 755, 756, 763), the court had for consideration and construction a policy of insurance which provided that 'double indemnity shall not be payable if the insured's death resulted from . . . committing an assault or felony.' In construing this provision the court said: 'We think the word "assault" as here used means something more than a simple assault. The language is that the double indemnity shall not be paid to the insured "from committing an assault or felony." If the insured had been killed while committing larceny, burglary, robbery, arson, or any other felony, no liability would attach. The word "assault" as here used refers to such an assault as would justify the person assaulted in taking his life. In other words, before appellee would be exempted from liability under its policy, Gilman (the insured) must have been guilty of such an assault as justified Walker (the person killing the insured) in firing the fatal shot. Whether Gilman made such an assault upon Walker was a question for the jury under proper instructions from the court.' See also Gresham *v.* Equitable Accident Insurance Co., supra; 29 Am. Jur. 737, § 981; Accident Insurance Co. *v.* Bennett, 90 Tenn. 256 (16 S. W. 723, 25 Am. St. R. 685); Employer's Indemnity Cor. *v.* Grant, 271 Fed. 136 (20 A.L.R.

1118, 1122). The Supreme Court of South Carolina adopted the rule with reference to an identical provision in a policy, that even if the assured be the aggressor in an encounter in which he is injured or killed, still the insured does not forfeit his insurance if he could not reasonably anticipate that he would receive bodily injury or be killed; and that ordinarily makes a question for the jury. However, if only one reasonable inference can be drawn from the testimony, then it becomes a question of law to be passed on by the court. Hope *v.* N. Y. Life Insurance Co., 186 S. C. 85 (195 S. E. 110). See Provident Life & Accident Insurance Co. *v.* Peace, 175 Okla. 266 (52 Pac. 2d, 769 (3, 4), 772). To illustrate: If A in anger, but without provocation, slapped B, or merely jerked him around, having nothing but his hand with which to injure B, and B then pulled from his pocket a pistol and killed A, A not knowing that B had a pistol or any other lethal weapon, and A having no cause to reasonably anticipate that he would be killed, or that they would otherwise engage in anything but a fist fight, a recovery by the beneficiary could be had under the double-indemnity (or accident) feature of this policy."

Under an application of the foregoing principles of law to the facts of the present case, the trial court erred in denying the motion for new trial, based on the special ground that it had erred in directing a verdict for the defendant insurance company as there were issues of facts which should have been submitted to the jury.

While, under one view of the evidence, a finding was authorized that the insured's death was not accidental within the meaning of the policy, and, under another view of the evidence, a finding was authorized that the insured came to his death in the commission of an assault upon his killer under circumstances which he could have reasonably foreseen would result in his death, and that, therefore, his death came within the exclusion of the policy, when all the evidence, including the testimony and the circumstances attendant upon the insured's death, together with all reasonable inferences to be drawn therefrom, is considered, it is apparent that the jury would have been authorized to find that the insured's death was accidental within the meaning of the

policy, and that his death did not occur under such circumstances as to bring it within the exclusion provision of the policy.

It appears from the evidence that the insured was killed by being shot by one Wilson Blaylock at a time when the policy was in full force and effect, and it further appears that the plaintiff had complied with all the conditions precedent to the filing of the suit under the terms of the policy. The insured's wife, the beneficiary named in the policy, had died in June of 1953 (they had no children), and at the time of the insured's death at some time during the night of January 10, 1954, he was residing at the home of one Louise Ramsey. According to Blaylock's testimony, he, a married man, had gone home with and to bed with Louise Ramsey and was asleep when the insured returned home. Blaylock had locked the front door to the house before retiring and he was awakened by the insured's breaking in the front door. The insured "ran upon" Blaylock with a knife and Blaylock fled into the night clad only in an undershirt. Blaylock went to the home of friends approximately a block away where he borrowed clothing, and then, having been given a ride by a friend to his home, he secured a shotgun and returned to the Ramsey house to secure his clothes which he had been forced to leave behind in his flight. When he returned to the Ramsey house he saw through a window that the insured and Louise Ramsey were in the back bedroom of the house, and the front door was open. He entered the front door and went to the back bedroom where the insured again "ran upon" him with the knife threatening to kill him. Blaylock backed out of the bedroom, where he had found the insured and Louise Ramsey upon his return, into the living room, and as he backed out of the house, he struck the front door so that he was unable to escape the insured who was coming upon him with an opened knife, and he fired one shot from his shotgun which resulted in the insured's death. He testified that he had not returned to the house with any intention of killing the insured, but only with the intention of securing his clothes. According to the testimony of other witnesses, Blaylock had come to the home of one of them where he had secured clothing and had endeavored to borrow a gun which the persons present would not lend him. Blaylock denied that he had endeavored to borrow

a gun, but admitted his efforts to borrow shells which he secured at another house. There was testimony that the insured was found lying dead upon his back in the living room of the Ramsey house with a bullet wound through his chest, with shattered glass. lying *on,* under and around him. There was testimony that a knife six inches in length, including the blade and handle, was found lying in his open, unclenched, outstretched *left* hand, although there was other testimony that the insured was the only one of five brothers who was *right-handed.* There was evidence that, following his first departure from the Ramsey house, Blaylock remained at the house where he secured clothing for approximately 30 minutes; that he returned to the house between 11:45 and midnight; that the plaintiff was notified of his brother's death at about 1 a. m.; that when he arrived at the Ramsey house, the officers investigating the matter were already there. The officers, who were called to the Ramsey house by a passing taxi-cab driver, testified that Blaylock was still at the house when they arrived, but they had no actual knowledge of how long the insured had been dead when they arrived, though one of them estimated that he must have been dead 10 or 15 minutes. The furniture in the back bedroom was disarranged and the bed had collapsed to the floor. The furniture in the living room seemed to be, more or less, in order.

From this evidence, we think that the jury would be authorized to find that, although the insured may have driven Blaylock from the house, that the insured had no reason to foresee that Blaylock would return to the house armed with a shotgun and shoot him; that although Blaylock testified that upon his return to the house the insured again ran upon him with the knife threatening to kill him, the insured did not do so but was shot by Blaylock through the glass window of the front door; and, that, since Blaylock and Louise Ramsey remained in the house for some little time after the insured had been shot, they had ample opportunity to do so and did place the knife in the insured's left hand, which was not the hand he customarily employed. Blaylock's indictment for voluntary manslaughter was also introduced in evidence, and that, although under circumstances described by Blaylock, he could have been found to have

been justified in shooting the insured, he pleaded guilty under the indictment.

*Judgment reversed. Gardner, P. J., and Townsend, J., concur.*