## 37649. CAROLINA LIFE INSURANCE COMPANY *v.* YOUNG.

DECIDED JUNE 30, 1959—REHEARING DENIED JULY 13, 1959.

*Wyatt & Morgan, L. R. Morgan, James R. Lewis,* for plaintiff in error.

*Richter & Birdsong, A. W. Birdsong, Jr.,* contra.

FELTON, Chief Judge. ■ The facts alleged in the petition do not show conclusively and as a matter of law that the homicide was not accidental within the meaning of the policy and the court did not err in overruling the general demurrer to the petition.

■

850

■ Mrs. Young testified on direct examination, as follows: "My name is Mrs. Agnes L. Young. Melvin Young was my husband. On the night of April 5th, this year, Mr. Young and I and our children had been to a party in honor of Mr. Pate, who was going overseas. At the time we went to that party, my husband and I did not have any argument of any kind. My husband was drinking that night, he started drinking down at the party, he had a reputation of drinking pretty heavily. As to who was drinking at the party, just the men folks at Mr. Pate's house. We went to his sister's house and left the men there, there were two women that went to get the men to come to supper and my husband and the rest of them had drinks. As I remember, we left for home about ten o'clock. As to whether my husband and I had any argument about who was going to drive home, we did not have any argument about who was going to drive home. Mr. Pate suggested that I drive home on account of his drinking and I did drive the car home. Telling the jury what took place after we got home, I got out of the car and took the kids in the house—I was sitting on the couch and he came in and went to the bathroom, I reckon, and he came back and said I was smart, he kept saying I was too smart not to let him drive home, and I told him I reckon I was and we started fighting and scuffling around, and he caught me on the porch and beat me with the jaws of his knife and he just shut me out there on the porch. The jaws of the knife was not open, it was closed at the time. By the jaws of the knife, I mean the ends of the knife. He beat me with the jaws of the knife on the porch and he shut me out and I broke the door in and went to the kids, they were screaming, I wanted to see that he did not harm them, and when I came in he had his knife open and was fighting me and we were all around in the house. I told him to leave me alone and he just kept coming and we went in around in the kitchen, he had the knife open, and I told him he better leave me alone, and I got the rifle in the bedroom and he kept coming after me and I said I bet I do stop you and as I started out to the porch, he grabbed the rifle and we were scuffling getting to the porch and evidently the rifle went off and struck him in the neck. The bedroom

where I secured the rifle from, is a back bedroom. From the time I secured the rifle until the time it was fired, I did not have any intention to kill my husband or to shoot my husband. Regarding this diagram of my house at 125 Webster Street, I secured the rifle from this back room. As to when did Mr. Young grab hold of the rifle, I was coming out and he was coming in and he took hold of the rifle, right here at the door. From there, we went to the kitchen through here to the porch, I was backing up. In other words, I secured the rifle here, this is the bedroom. That is correct, I picked it up and went from here to the porch, he had his hands on the rifle all the time. I could have shot him at any time from the time I secured the rifle, from the time I took it from the wall. There was nothing to prevent me. As to what happened when I reached this porch here, I snatched loose from him and the rifle went off. As to which way I was holding it, I was holding it like this. As to which way did I snatch it, like this. That is when the rifle went off. I retreated from the bedroom through the kitchen to the door all that time. As to when he had his hand on the rifle, from the door right here all the way through here. As to why I went back in the house after he beat me on the porch, because the kids were screaming for me, they were afraid and they were screaming and I went in there to keep him from bothering them. As to what size rooms are in my house, just approximately, I would say about ten by twelve, all approximately the same size. During the time I was retreating from him, I did not ever at any time point the rifle at him. At the time of the shooting, he had his hand on the rifle. When I snatched loose it went off, I do not know why. As to why I was going from the bedroom all the way to the porch, I was going to try to keep him off me until I could get the police. I do not have a telephone in the house. Yes, I have been beaten by my husband before, and left unconscious before. Three times, I did not hurt him then. As to what was in his hands the three times he knocked me unconscious, a claw-hammer, a pot and a stick. He assaulted me on other occasions, and he was never hurt on those occasions. He was drinking on this particular occasion, he was pretty bad for drinking and had

been for years. I did not intend to shoot or injure or hurt my husband. I did not have any intention." She testified on cross-examination, as follows: "Yes, on occasions he had pulled a knife on me before. This is not the first time I mentioned the knife. I had never pulled a gun on him before. My husband and I got home and the arguing began, that is correct, sometime after ten o'clock. After we were arguing for a while he knocked me down on the living room floor and got on top of me. He started beating me with his fists and the knife was not used. I managed to get off the floor and run out on the porch and then he followed me out on the porch. He went back into the living room and latched the door. I was able to break the latch and get back in the house and when I got back in he was waiting for me in the living room with an open knife. He started cutting at me with the knife when I came in, from the front door of the living room, he started cutting at me. I went from the living room to the kitchen and he was still after me cutting at me with the knife. He was not saying anything to me, he was after me and I said leave me alone. He wasn't threatening to kill me. I got into the kitchen and he was still cutting at me with the knife and I made the statement I bet I do stop you. I went into the bedroom and got the 22-calibre rifle. I did not pick it up and point it at him or in his direction. As to whether I was pointing it at anyone, what I was doing with it, I was trying to scare him off. I picked up the rifle for the purpose of protecting myself, I thought it would scare him. On three different occasions he had left me unconscious. I picked up the rifle to protect myself. He grabbed the rifle with his left hand, he was still holding the knife in the right hand. He was still cutting at me with the knife, he was pulling on the rifle and cutting at me. He was trying to get the rifle away from me. I was still holding the gun when he held the barrel with one hand, and I backed off, with him cutting at me. As to whether on the porch he was still cutting at me, he was trying to take the rifle away from me at that time. At that time he was cutting at me, he cut part of my clothing, yes he came close enough to cut something. As to what part of my clothes did he cut, up here in the neck. He was cutting at my neck

with that knife as to whether or not he was still cutting at my neck with that knife when I got to the porch, no sir, he was just cutting at me with the knife, holding the rifle with one hand. As to whether the gun when I picked it up was not cocked, as far as I know it wasn't. The children were in that room. I wouldn't have cocked a gun in the room like that with the children. Some time after I picked the gun up until I got on the porch, the gun had to be cocked to put it in firing position. Nobody else could have cocked it. It had to be cocked to go off like that. As to whether I cocked it after he wouldn't leave me alone, I don't remember cocking it. As to whether I picked up this rifle to protect myself, I thought I would scare him off. There at the porch, he was still cutting at me with the knife and holding the gun, the gun was cocked and had been cocked sometime between then and the time I picked it up. As to what happened then, when I snatched it loose, the gun went off. I knew he had been struck, he began bleeding and he fell back against the door and hollered something about somebody helping him. At the time I pulled the gun back, he still had hold of it with one hand. He was still after me with the knife. As to whether at all times he was pursuing me trying to cut me with the knife, as far as I know, he was. The only defense I had was the gun. After I shot him, he came to rest on the porch. As to where was the knife then, it was at his feet. He still had it when I called the police. He was still holding the knife, and when I came back, it was at his feet." Mrs. Young's testimony shows conclusively and as a matter of law that the husband should have anticipated that under the circumstances related by Mrs. Young the natural and probable result of his conduct would be that he would be shot either as a result of the struggle or by the deliberate act of Mrs. Young.

"In order for a plaintiff to recover under a double-indemnity provision of an insurance policy for death resulting, independently of all other causes, from bodily injuries caused solely by external, violent, and accidental means, it is incumbent upon him to show that in the act which preceded the injury alleged to have caused the death of the insured something 'unforeseen,

unexpected, or unusual occurred.'" *Thompson* v. *Prudential Ins. Co.*, 84 *Ga. App.* 214, 218 (66 S. E. 2d 119) and cases cited. "There can be no accident, as a matter of law, without existence of a fact or facts pointing to death through accidental means. It is incumbent upon the plaintiff to show that in the act or acts which preceded the injury alleged to have caused the insured's death something unforeseen, unexpected, or unusual happened. The test seems to be: Did the insured appreciate that by doing the act he was putting his life and limb in hazard?" *Riggins* v. *Equitable Life Assurance Soc.*, 64 *Ga. App.* 834, 835 (14 S. E. 2d 182).

The case of Podesta *v.* Metropolitan Life Ins. Co. (1941 Mo. App.) 150 S. W. 2d 596, involves a contention by the plaintiff wife that her shooting of her husband, the insured, during a struggle for possession of a revolver, was unintentional on her part and the fatal injury was therefore accidental. In reversing a judgment for the plaintiff, the Missouri Court of Appeals said: "Here the insured was not only the aggressor as shown by plaintiff's own recital of the facts, but his fatal injury was inflicted in the course and as the result of the forcible resistance which plaintiff courageously offered to his aggression, so that his death was clearly not by accidental means, unless it should be, in line with plaintiff's theory as to her right to recover under the policy, that the situation was altered by the fact that notwithstanding all the other pertinent circumstances in the case, she had no intention of shooting the insured. In other words, she would have the result in the case depend, not upon the insured's aggression and legal invitation of the natural and probable consequences of the character of assault he had committed, but rather upon the question of her own personal intention with respect to bringing about the death of the insured. She argues, therefore, that since her act in discharging the revolver (if she did discharge it) was wholly unintentional on her part so far as the evidence directly discloses, it was consequently accidental, making the insured's death correspondingly accidental, and thereby serving to distinguish the case at bar from the usual case of this general import, where the person

resisting the aggression of the particular insured deliberately intended the act which resulted in the latter's violent death. The obvious fault in plaintiff's position lies in its disregard of the fact that the provision of the policy insuring against the results of bodily injuries sustained by accidental means applies to the acts and conduct of the insured himself, and not to the acts, conduct, or intention of plaintiff as the one inflicting the fatal injury. [Citing cases]. So it is, depending upon the facts of the particular case and the coverage of the policy, that the death of an insured may be accidentally sustained, even though intentionally inflicted by his adversary, while conversely, the insured's death may not be accidental, notwithstanding the fact that the person responsible for his death may have had no actual intention of killing him."

The case of Koester *v.* Mutual Life Ins. Co., 36 Del. 537 (179 A. 327) differs in no material circumstance from the case at bar. In affirming a judgment for the insurer, the Supreme Court of Delaware said: "In a struggle to obtain possession of a loaded firearm, whether automatic and equipped with safety devices or not, the discharge of the weapon during the struggle was not an unforeseeable nor unusual result. It was a natural consequence of the effort made by the insured to obtain the weapon, and might well have been expected as probably apt to occur during the course of the struggle. This voluntary attempt of the insured, we think, was the direct cause of his death. If there had been no such attempt by the insured, there would have been no such injury to him. Therefore, his death was not caused by accidental means within the meaning of the policies of insurance."

In *Johnson* v. *Southern Life Ins. Co.*, 95 *Ga. App.* 625 (98 S. E. 2d 382) this court held: "It is for the jury to determine whether or not death by being shot by another is an accident, where the evidence, together with all reasonable inferences to be drawn therefrom, is conflicting as to whether or not the insured's own wrongful assault produced his death, or whether or not he voluntarily and intentionally committed an assault from which he foresaw, or could have foreseen, that death might result."

The evidence demanded a finding that the death was not accidental and the court erred in denying the motion for a judgment notwithstanding the verdict.

The judgment denying such motion is reversed with direction that the court enter up judgment in accordance with the motion. It is not necessary to rule on the exception to the denial of the motion for a new trial.

*Judgment affirmed in part and reversed in part with direction. Quillian and Nichols, JJ., concur.*

### ON MOTION FOR REHEARING.

It is contended by the defendant in error that this court has overlooked previous decisions which have left the question of accidental death to the jury where the death of the insured occurred during the course of an altercation with his wife or some other person. In *Riggins* v. *Equitable Life Assurance Soc.*, 64 *Ga. App.* 834, 840 (14 S. E. 2d 182), this court held: "Under one phase of the evidence in the instant case, the jury would have been authorized to say that the fights between the insured and his wife were so common that when he attempted to and did force open and break down the door to his apartment, and attempted to enter his home, there was no reason for him to believe his wife would shoot him. It might be said, as a matter of common knowledge, that some men in an intoxicated condition have entered their homes (when they knew their wives were therein) at unseemly hours and in an unseemly manner, and that one would not necessarily expect to be killed on such an occasion, especially where the wife knew it was he. In other words, the insured did not necessarily appreciate that by doing the act of forcing the door and breaking into his own home he was putting his life in *hazard*." (Emphasis added). The distinction between the facts of the situation in that case and the instant case is obvious. Here, the deceased insured actually undertook to struggle for possession of a loaded firearm and the evidence of previous altercations with his wife which did not involve the use of a dangerous instrumentality on her part does not suffice to create a question for the jury under these circumstances. The following cases are likewise clearly distinguishable upon their facts: *Empire Life Ins. Co.* v. *Einstein,*

12 *Ga. App.* 380 (77 S. E. 209); *Nelson* v. *American Nat. Ins. Co.*, 67 *Ga. App.* 775 (21 S. E. 2d 658); and *Johnson* v. *Southern Life Ins. Co.*, 95 *Ga. App.* 625 (98 S. E. 2d 382).

*Rehearing denied.*