**Andrew DAVIS, Plaintiff,**

v.

**CONTINENTAL CASUALTY COMPANY, a/k/a CNA Insurance, Defendant.**

**Civ. A. No. DC 81–120–WK–O.**

United States District Court, N.D. Mississippi, Delta Division.

April 1, 1983.

724

Johnnie E. Walls, Jr., Greenville, Miss., for plaintiff.

Kay Farese Luckett, Clarksdale, Miss., for defendant.

## MEMORANDUM OPINION

KEADY, District Judge.

In this diversity action, plaintiff, Andrew Davis, a resident of Bolivar County, Mississippi, designated as the beneficiary in an accident insurance policy on the life of Jimmie Nell Davis issued by defendant, Continental Insurance of Chicago, Illinois, sues to collect the policy proceeds. On June 22, 1979, the insured, Jimmie Nell Davis, who was the wife of plaintiff, died of a gunshot wound. At the time of death, the insured, as an employee of Baxter Travenol Laboratories, Inc., of Cleveland, Mississippi, was covered against accidental death for $100,-000 by defendant's group policy.

Defendant has denied liability on three grounds:

(a) Plaintiff brought about the insured's death intentionally and by design, thus precluding him under Mississippi law from recovering as the policy beneficiary.

(b) The insured's death was not accidental.

(c) The insured's death was expressly excluded by the policy since it was a result of

suicide or self-destruction on her part. No evidence having been offered by defendant to pursue the issue as to the third ground, the court treats that defense as abandoned at trial.

After discovery and pretrial conference, the court conducted full evidentiary hearing, receiving oral and documentary evidence from both sides, heard oral argument and considered proposed findings of fact submitted by counsel. After mature consideration, the court makes findings of fact and conclusions of law, as required by Rule 52(a), Federal Rules of Civil Procedure.

## I. *Findings of Fact*

Plaintiff and the insured, Jimmie Nell Davis, resided together in Winstonville, a small town in Bolivar County, Mississippi. After their marriage in 1973, two children were born and lived with them. In June 1979, both plaintiff and Jimmie Nell were employees of the Baxter Travenol plant at Cleveland and worked the day shift. On June 21, plaintiff left his shift at approximately 3:00 p.m. and did not return home until 9:15 or 9:30 that night. According to plaintiff, he first made a business trip to Greenville and attended a barbecue party at Renova. Plaintiff's testimony is the only direct evidence of what occurred. Upon entering the house, according to plaintiff, he went to the bedroom, turned on the light and began undressing. Jimmie Nell immediately began to question him, demanding to know where he had been, and accusing him of having been out with a woman. This led to an argument which so enraged Jimmie Nell that after trying to hit plaintiff with a telephone, she obtained a 20-gauge shotgun and attempted to load it. Plaintiff was aware that the shells she was attempting to load into the shotgun were 12 and not 20 gauge shells and knew that the weapon would not fire. He grabbed the shotgun from his wife's hands and threw it on the floor. At this point, plaintiff put on his clothes and went to the kitchen, intending to leave the house. However, Jimmie Nell then confronted him with a butcher knife. He caught her arm and threw the knife to the floor. According to plaintiff,

he returned to the bedroom and got his work uniform to have the next morning and as he went down the hall towards the kitchen, he heard a clicking noise. He dropped the uniform, turned and saw Jimmie Nell holding a 22 single action pistol in her hand. Plaintiff was thirteen inches taller than his wife. He grabbed both hands and struggled for possession of the gun. As they moved into the kitchen still struggling, the gun was discharged and struck Jimmie Nell behind her ear on the rear left side of her head. The gun fell from Jimmie Nell's grasp and she collapsed on the kitchen floor in a pool of blood. Plaintiff stated that although, not at first realizing that his wife had been shot, he saw the blood and rushed across the street to a neighbor's house for assistance. Jimmie Nell's brother and a doctor were summoned to assist in removing Jimmie Nell by ambulance to a local hospital; she was then transported to the University Hospital at Jackson. Although there were signs of life for a period of hours, she did not regain consciousness and died the next day from brain damage.

At approximately 10:30 p.m., county law enforcement officers arrived at the house, photographed bloodstains on the floor, walls and above the door in the kitchen, found a 22 pistol with live shells and two empty hulls in a cabinet above the kitchen stove, lead fragments on the kitchen floor near bloodstains, a butcher knife, and also a 20-gauge shotgun elsewhere in the house. On June 23, an autopsy, ordered by the state court, was carried out by Dr. Leo J. Scanlon, a Vicksburg pathologist. The pathologist confirmed that the bullet entered the deceased's head behind the left ear with the bullet not exiting and lodging in the brain. He did not detect powder burns at or near the wound site, and took hair from the wound site for analysis at the state crime laboratory. Scanlon also noted the presence of a deep laceration or gash two inches wide on the deceased's forehead above left eye, which he stated was caused by blunt force and not pistol shot. No other evidence of injury or trauma to the body was noted, and the deceased's fingernails were too short to enable the pathologist to deter-

mine if patches of skin that might indicate signs of struggle might be present.

Following the criminal investigation, plaintiff was indicted for murder in a state court; when the jury was unable to agree, a mistrial was declared. Upon motion of plaintiff's counsel, the case was passed to the files and no reprosecution has since been started.

At our trial, the defendant introduced the physical evidence presented at the state court trial and called as witnesses Dr. Scanlon and two investigating law enforcement officers, Lester B. Gammil and James W. Harper. Dr. Scanlon expressed the opinion that the pistol had to have been fired more than ten inches from the forehead because of the absence of powder burns; on cross examination, however, he admitted that he had expressed an earlier opinion that powder burns might not be detectable if the weapon was fired more than six or eight inches from the wound site. He reaffirmed his earlier opinion that the gash on the deceased's forehead could have been caused by her either being struck by a hard object or by falling against one. He also stated that he had never seen the state crime lab report on the hair which he had cut from the decedent's head and was therefore not in a position to state whether the analysis of hair disclosed powder burns. The laboratory report, if one was ever made, was not offered at trial. The pathologist stated that the bullet had entered the head at a slanting, tangential angle when the weapon was fired, he thought, at least ten inches away from the deceased's head, and the bullet almost missed striking the head.

Both Gammil and Harper testified that in their opinion lead fragments found on the kitchen floor had been fired from a 22 pistol. Yet, the officers found no mark on the kitchen tile floor or anywhere else in the room to indicate the path or course of a second shot. Moreover, the ballistics report from the state crime laboratory failed to establish that these lead fragments had been fired by the 22 pistol or any other gun.

It is evident that the circumstantial evidence urged by defendant presents an issue of fact which, at first blush, tends in some respects to refute plaintiff's testimony. When the physical facts are carefully weighed, however, they lose probative force, in our opinion, to override plaintiff's essentially uncontradicted testimony. His version of the incident is not inherently improbable or unbelieveable, nor is it overridden by countervailing inferences. Plaintiff impressed the court as a candid witness who, while admitting gross marital misconduct, adamantly claimed that he intended no harm to his wife and did not shoot her. Absence of powder burns from the wound site is not without some force, yet from the nature of the struggle between plaintiff and his wife with each others' hands and arms outstretched and locked as they grappled for the gun, the pistol might well have discharged or gone off more than ten inches from the head. The angle at which the bullet penetrated the skull is wholly consistent with plaintiff's description of the struggle. We must only speculate as to what blunt force produced the forehead gash or laceration. Jimmie Nell fell face upward, in a room with table and chairs. The blow might well have been caused during the struggle before the gun was discharged or by Jimmie Nell's striking a hard object in falling. It is true that plaintiff had no explanation for presence of lead fragments on the kitchen floor, but this does not persuade the court that the fragments came from the 22 pistol as a second shot. Jimmie Nell, unmistakenly, was shot only once, and there was no evidence elsewhere in the room to suggest or indicate another bullet had been fired from the pistol. Necessarily, had the gun been fired a second time (and thus contradicting plaintiff's version), there would have been conclusive evidence of such occurrence. Since the ballistics report does not establish that the lead fragments came from any gun, we find the contrary opinions of Gammil and Harper to be of little, if any, weight. Plaintiff's corroborated explanation as to the second empty hull from discharging the pistol in target practice several weeks earlier is more probative. Because of these considerations,

the court concludes that the plaintiff has truthfully testified about the circumstances under which his wife met her death and finds that he did not shoot her or intend to bring about her death.

The undisputed evidence is that plaintiff repeatedly carried on affairs with other women, to which Jimmie Nell violently objected. Plaintiff's notorious philandering was often the subject of heated arguments, for she knew of his adulterous relations, was aware that he had sired children by at least two paramours, one of whom plaintiff married some months following Jimmie Nell's death. At trial, plaintiff admitted that he often lied to Jimmie Nell when she accused him of being unfaithful to her, and that because of her jealousy, they stopped going to parties and social functions. Jimmie Nell was wont to go into extreme rages about plaintiff's infidelities; she once consulted an attorney about a divorce, but never filed such an action against him. Except for a very brief period of time, they never separated and continued to live together as husband and wife. Plaintiff conceded that his wife's arguments usually arose during weekends when he would arrive home at late hours; and notwithstanding her objections, he continued to have affairs with other women. This produced some stormy episodes. On one occasion seven or eight months before her death, Jimmie Nell began arguing with plaintiff when he entered the house late at night, and she got a loaded 12-gauge shotgun and pointed it at him while he was in the bed. At that time, plaintiff was able to deflect the gun by knocking it upward as it fired into the ceiling. Plaintiff obtained the shotgun from Jimmie Nell, broke it down, took out bullets and placed both the shotgun and a 22 pistol, which was fully loaded, into the tool box on his truck and locked it. Plaintiff maintained he did this for his own protection since he knew that his continued association with women would enrage his wife. Later, about three months before the fatality, Jimmie Nell, in a violent tantrum, broke a door to enter a room where plaintiff had gone, and she wielded a knife at him. This time, plaintiff was cut on his arms and neck before he was able to knock the knife from his wife's hand. Plaintiff asserted that he never attacked or physically assaulted his wife but always acted to disarm her. He had, however, taught Jimmie Nell how to use weapons, shotguns as well as the 22 pistol. She understood the safety mechanism on the 22 which had to be cocked to fire each bullet and the dangers of weapons.

Although plaintiff had guns around the house which he used in hunting, he realized that Jimmie Nell would resort to threatening him with firearms in her temper rages if they were accessible. Several weeks before the fatal shooting, while he was working on a car radiator with Lamar Smith, plaintiff opened the tool box on the truck to get tools and removed the loaded 22 pistol. Both plaintiff and Smith stated that on that occasion, plaintiff fired one shot at a telephone pole as target practice before bringing the pistol into the house. According to plaintiff, he did not recall where he left the gun in the house but is positive that he did not fire it again.

Plaintiff's testimony was that he never physically assaulted or threatened his wife or ever acted in any way, when the insured brandished any kind of weapon and threatened to harm him, other than to disarm her and remove the weapons from her possession. Defendant does not challenge this testimony, which the court accepts as true. The insured had no reason to believe that the plaintiff would retaliate with violence or to resist her with deadly force.

The court finds as a fact that Jimmie Nell, in her previous disputes with plaintiff, all of which centered upon her accusations of infidelity, never found or experienced that plaintiff would physically attack or fight her, or resort to weapons to defend himself against her own violent aggression, and, considering the domestic situation that had prevailed, she expected and had every reason to expect that the plaintiff, as on previous occasions, would do no more than disarm her. In fact, that was precisely the response in which the plaintiff was engaged when the pistol, unexpectedly to the insured, fired the fatal shot.

## II. *Conclusions of Law*

Federal court jurisdiction exists because of diversity of citizenship and requisite amount in controversy, 28 U.S.C. § 1332, and the parties acknowledge that Mississippi law is controlling.

■ The heart of this lawsuit and the focal legal issue upon which recovery by plaintiff is hinged can be simply stated—was the death of Jimmie Nell Davis, the insured, accidental within the meaning of the insurance policy? If her death was accidental, plaintiff is entitled to recover the proceeds of the policy unless by his own actions he has forfeited his own right as a beneficiary to recover. In *Fidelity & Casualty Company v. Johnson,* 72 Miss. 333, 17 So. 2 (Miss.1895), where the insured died at the hands of a mob by hanging, the Mississippi Supreme Court included within the definition of accidental death a situation

> in which death occurs by violent means, external to the man, and against or without intention or concurrence of will on the part of the man, death may probably be called an accident . . . .

17 So. 3. Once proof establishes that the insured died through external and violent means, a presumption arises that such injury was sustained through accidental means. *Taylor v. Insurance Company of North America,* 263 So.2d 749, 751 (Miss.1972). Thus, it is well settled that there is a distinction between death through accidental means and a true accidental death. Death by accidental means, the relevant standard under defendant's insurance policy, is determined from the position of the insured whereas a true accidental death is determined from an objective viewpoint. Consequently, although a third party may have intended to cause the death of the insured, the insured's death may still have been sustained through accidental means within the definition of accident under the policy. See *Occidental Life Insurance Company v. Barnes,* 226 Miss. 396, 84 So.2d 423 (Miss. 1956).

■ It is manifest that in the instant case the insured's death was caused by external and violent means, i.e., a gunshot wound to the head. Therefore, plaintiff established a prima facie case of the insured's death by accidental means. The defendant was then required to go forward with proof to rebut plaintiff's prima facie case and it has attempted to do such by two alternative means. First, it has attempted to show that plaintiff intentionally killed the insured without justification. Second, it has attempted to show that the insured was the aggressor and foresaw or reasonably should have foreseen that her own acts would lead to her death.

■ If a beneficiary wilfully and without justification takes the life of the insured, he is barred from recovering the proceeds of the insurance policy. *Gholson v. Smith,* 210 Miss. 28, 48 So.2d 603, 604 (Miss.1950); *cf.* Miss.Code Ann. §§ 91–1–25, 91–5–33 (1972). Since defendant has failed to prove by a preponderance of the evidence, however, that plaintiff wilfully and without justification took the life of the insured, and the court has found on the facts that plaintiff did not intentionally bring about her death, we must pass to defendant's second defense and evaluate its sufficiency.

■ Mississippi courts adhere to the general rule that

> where one is insured against accidental injury or death, and the insured culpably provokes an encounter, or is the aggressor therein, in the course of which, or as the result of which, the insured is killed or injured, the death or injury is not accidental within the meaning of the policy; for in such case, the injury or death is the natural and probable consequence of the act of the insured, and cannot be said to be accidental.

*Taylor v. Insurance Company of North America, supra,* 263 So.2d at 752; *Occidental Life Insurance Company v. Barnes, supra,* 84 So.2d at 424. Nevertheless, even though the insured was the aggressor, "where the insured did not know and had no reason to believe that his misconduct would result in his death, his injury and death may be found not to have been reasonably contemplated or foreseeable and so

to be 'accidental' to the insured." *Taylor v. Insurance Company of North America, supra,* 263 So.2d at 752. The insured's death must have been reasonably foreseeable by him or by a reasonably prudent man in *his* position. See 43 Am Jur 2d Insurance § 588, p. 653 (1982). Hence, we must evaluate and determine what was reasonably foreseeable by Jimmie Nell Davis or a reasonably prudent person in *her* position. This presents primarily a question of fact for us to decide in this non-jury case as well as to furnish the legal principle for our guidance.

It is generally held that when the insured is the aggressor and is armed with a deadly weapon that his resulting death is not accidental. *O'Bar v. Southern Life & Health Insurance Company,* 232 Ala. 459, 168 So. 580 (Ala.1936); *see* Annot., 49 ALR 3d 673, 691 (1973). In a family quarrel, however, courts are more inclined to find that death is an accident despite aggression by the insured with a deadly weapon. *Taylor v. Insurance Company of North America, supra* 263 So.2d at 753; 43 Am Jur 2d Insurance § 589, p. 655 (1982). The family relationship alone is not sufficient to make the insured's death accidental, but merely alters the backdrop against which reasonable foreseeability is considered. Reasonable foreseeability remains a factual issue determined by the prior quarrels between the feuding family members. Courts in such familial situations may not conclude the result as a matter of law.

In *Carolina Life Insurance Company v. Young,* 99 Ga.App. 848, 110 S.E.2d 67 (Ga. App.1959), the insured husband was beating his wife and threatening her with a knife. She grabbed a gun and threatened to kill him if he did not leave her alone. The husband grabbed at the gun and in the ensuing struggle was shot and killed. In considering the issue of reasonable foreseeability of the insured's death, the court noted that the wife had never retaliated using a deadly weapon in her defense. Therefore, the court held that since the wife had never used a deadly weapon in retaliation, it was for the jury to decide whether the insured could have reasonably

foreseen that his continued aggressiveness could result in his death. In *John Hancock Mutual Life Insurance Company v. Dutton,* 585 F.2d 1289 (5th Cir.1978) (applying Georgia law), the insured husband was quarreling with his wife and removed a gun case from under the bed and began unsheathing a loaded shotgun. His wife acquired a pistol and shot and killed him as he was removing the shotgun. A jury found that the insured's death was accidental, and the Fifth Circuit affirmed. In reaching its decision, the Fifth Circuit noted that the insured on numerous occasions had threatened and attempted to shoot her, run over her with a car, and cut her with a knife, but that his wife had never responded with force. Because the wife had never responded with force, the court found that it was reasonable for the jury to determine that the insured was not afraid of his wife and did not believe that she would shoot him in retaliation. Accordingly, the verdict that the shooting was accidental was allowed to stand.

We find *John Hancock* to be factually analogous to the case *sub judice* and apply the legal principles espoused in that case, which plainly comports with our reading of Mississippi case law. Because the insured, Jimmie Nell Davis, had on prior occasions threatened plaintiff with deadly weapons and plaintiff had never retaliated with force but had merely disarmed her and then fled, we hold that it was reasonable for the insured to have foreseen that plaintiff would merely attempt to disarm her and then leave the house. Accordingly, we hold that the insured's death was accidental within the meaning of the insurance policy and that plaintiff is entitled to recover the proceeds of the policy.

Since plaintiff did not file proof of loss until August 25, 1980, and the policy sued on allowed defendant sixty days after submission of written proof of loss before being required to pay same, we find that prejudgment interest in this case should not run, as plaintiff contends, from the date of death, but from October 25, 1980, marking

the sixtieth day after his submission of written proof of loss. Since the amount of the claim is liquidated and we find no equities existing in favor of defendant to excuse it from making prompt payment, this is a proper case for the allowance of prejudgment interest because of the defendant's breach of contract. Interest from October 25, 1980, shall accrue at the current federal rate of 9.16% per annum until paid, as established by Section 302 of the Federal Courts Improvement Act, P.L. 97–164, effective October 1, 1982.

Let an order so issue.